**UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **NORTHROP GRUMMAN INFORMATION TECHNOLOGY, INC.** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No. 05-595C** |
| **THE UNITED STATES OF AMERICA,** | ) | **Hon. Loren A. Smith, Senior Judge** |
| **Defendant.** | ) | |

**MEMORANDUM OF PLAINTIFF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Respectfully submitted,

/s/ Michael E. Geltner, Esq.
Michael E. Geltner, Esq.
Geltner & Associates, P.C.
Number 10 E Street, S.E.
Washington, D.C. 20003
T: (202) 547-1136
F: (202) 547-1138

*Attorney for Plaintiff*
*Northrop Grumman*
*Information Technology, Inc.*

# TABLE OF CONTENTS

**Page**


QUESTIONS PRESENTED . . . . . . . . . . . 1

I. INTRODUCTION . . . . . . . . . . 2

II. PROCEDURAL HISTORY . . . . . . . . . 2

II. FACTS . . . . . . . . . . . 3

A. The Contract . . . . . . . . . . 3

B. CECOM and the Procurement . . . . . . . 3

1. The Initial Stage . . . . . . . . 3

2. The Order . . . . . . . . . 5

3. Logicon's Reliance on the Warranty . . . . . . 5

4. The Software . . . . . . . . . 6

5. The End . . . . . . . . . 6

C. The Claim and Decision . . . . . . . . 7

1. The Claim . . . . . . . . . 7

2. The Decision . . . . . . . . . 7

IV. ARGUMENT . . . . . . . . . . . 7

A. Breach of Warranty . . . . . . . . . 7

B. The Warranty in this Case . . . . . . . . 8

C. Breach of Warranty . . . . . . . . . 9

D. Reliance . . . . . . . . . . 10

E. Damages . . . . . . . . . . 10

F. Summary Judgment Standards . . . . . . . 10

V. CONCLUSION . . . . . . . . . . 11

# TABLE OF AUTHORITIES

**Page**

## Federal Cases


Caffall Pros. Forest Prods., Inc. v. United States
230 Ct. Cl. 517, 678 F. 2d 1071 (1982) . . . . . . . . 8

Dale Constr. Co. v. United States
168 Ct. Cl. 692 (1964) . . . . . . . . . 8

Everett Plywood & Door Corp. v. United States
190 Ct. Cl. 80, 419 F. 2d 425 (1969) . . . . . . . . 8, 9

James S. Lee & Co. v. United States
9 Cl. Ct. 322 (1986) . . . . . . . . . . 11

Kolar, Inc. v. United States
227 Ct. Cl. 445, 650F. 2d 256 (1981). . . . . . . . 8, 9, 10

Meade v. United States
27 Fed. Cl. 367 (1992) . . . . . . . . . 11

Miller v. Robertson
266 U.S. 243, 69 L. Ed. 265, 45 S. Ct. 73 (1924) . . . . . . 10

Municipal Leasing Corp. v. United States
____ Ct. Cl. ___ (1986) (No. 428-82C) . . . . . . . 10

Oman-Fischback Int'l (JV) v. Secretary of the Navy
276 F. 3d 1380 (Fed. Cir. 2002) . . . . . . . . 8

Paccon, Inc. v. United States
185 Ct. Cl. 24, 399 F. 2d 162 (1968) . . . . . . . . 8

Rumsfeld v. Applied Cos.
325 F. 3d 1328 (Fed. Cir. 2003) . . . . . . . . . 11

Walter Dawgie Ski Corp. v. United States
30 Fed. Cl. 115 (1993) . . . . . . . . . 8

Wells Fargo Bank, N.A. v. United States
88 F.3d 1012 (Fed. Cir. 1996) . . . . . . . . . 10

White v. Delta Constr. Int'l, Inc.
285 F. 3d 1040 (Fed. Cir. 2002) . . . . . . . . 11

**Statutes**

Uniform Commercial Code § 2-313(2) . . . . . . . 8

## QUESTIONS PRESENTED

1. Whether statements in an essential need letter that software being procured is "essential" and "integral" to the Government user, when incorporated by reference in a Contract Order as an inducement for the Contractor to lease to the Government over multiple fiscal years with renewal options, are a warranty of the facts affirmed?

2. Whether the government breached the warranty, because the supposedly essential and integral software was being procured based on its "potential" and was not demonstrated or tested or used in the user's systems?

3. Whether plaintiff is entitled to recover, as damages, the sum of remaining payments due from the Government, where all costs of performance had been expended and could not be recovered?

## I. INTRODUCTION

This is an action under the Contract Disputes Act of 1978 ("CDA"). Plaintiff contracted with the United States Air Force to lease certain Starburst software over four fiscal years, to be used by the Army. The Air Force failed to exercise the renewal options for fiscal years 3 and 4. This Motion for Summary Judgment is based solely on the ground that the Government breached the warranty of essential need contained in the contract which induced plaintiff to enter into the contract.

## II. PROCEDURAL HISTORY

The contract[1] was issued to Logicon, Inc., a subsidiary of Northrop Grumman Corporation. Logicon assigned the payments to a financing institution, ePlus Government, inc., and this is a sponsorship action. Northrop Grumman Corporation reorganized certain of its subsidiaries, including Logicon, Inc., and, originally, suit was brought in the name of Northrop Grumman Computing Systems, Inc. ("NGCS"), which was the business unit successor to Logicon, Inc. No. 03-23C. The Government moved to dismiss on the theory that NGCS was not the legal successor to Logicon, Inc. Plaintiff agreed to dismiss without prejudice and then refiled the claim and bought this suit in the name of Northrop Grumman Information Technology, Inc., a Delaware corporation, which is the legal successor in interest to Logicon, Inc. Hereafter, Logicon, Inc. will be referred to as "Plaintiff."

---

[1] The contract in suit is in the form of a delivery order, App. 85, issued to Logicon, Inc. under Logicon's Contract No. F01620-94-D-0002 with the Air Force. The actual terms are in the delivery orders and renewals, App. 85-129.

## III. FACTS

### A. The Contract

The contract in suit was issued by the Air Force October 20, 1999 in the form of an order against plaintiff's I-CASE contract with the Air Force responding to plaintiff's Special Offer #330 Revision 03 dated October 18, 1999. App. 85. Under the Order, plaintiff was to provide Starburst Omnicast software ("the Software"), App. 93, under a lease which provided for a base payment and three option years payments of $285,000 each. The Order incorporated by reference the Leasing Terms and Conditions that were part of Special Offer #330 Revision 03. App. 86. The Leasing Terms and Conditions (at App. 95) provide:

> It is hereby mutually understood and agreed that as inducement for Contractor entering into this Agreement, the Government has provided required information relative to the essential use of the software Asset which includes, but is not limited to, a description of the currently identified applications to be supported and planned life-cycle operations for the leased software.

Prior to the date of the Order, the Army, on September 22, 1999, provided plaintiff with a "Letter of Essential Need," App. 84, which contained the following language:

> PEO C3S has decided to enter into a lease agreement for the Starburst database products to support ABCS 6.0 and beyond. These products are essential to the operation of ABCS 6.0 as they are integral to the system. After considering the alternatives, it was determined that a lease was the most cost-effective means of providing long-term, Program-wide access to the Starburst products.

As will be explained below, the warranty that the software was "essential to the operation of ABCS 6.0 as they are integral to the system" was false.

### B. CECOM and the Procurement

#### 1. The Initial Stage

The U.S. Army Communication-Electronics Command ("CECOM") is located in Fort Monmouth, New Jersey. App. 27. Joseph Johnson was a civilian systems engineer employed by

CECOM as chief of horizontal technology integration, responsible for developing communication systems within the Army. App. 31-32. He covered various programs, such as "fire support, maneuver control, intelligence, electronic warfare." App. 32. These separate systems interacted with each other. "The software itself did not fit within these programs, per se. That software was to be used with some of that program's equipment to bring a multicast capability to the communications system," App. 32, meaning that the various Army systems communicate with one another, and "[t]he multitask software was to improve the efficiency of those communications among those systems." App. 33. It was to allow for "more efficient use of bandwidth" between the systems. App. 34.

The Software was not part of CECOM's systems. A Starburst sales representative named Rick O'Brien made a cold marketing call in 1999 on Mr. Johnson, App. 35. Mr. O'Brien discussed with Mr. Johnson "the potential of this software," App. 37, in a "marketing pitch type of thing."[2] After Mr. O'Brien's "marketing pitch," App. 39, CECOM decided to go ahead, thinking "it was going to allow us to pass data more efficiently." App. 41. Mr. Johnson testified, "There was no precontract demonstrations…" App. 42. Mr. Johnson was the CECOM decision maker, *id.*, and his reason was, based on talking with Mr. O'Brien, "that there was a potential for the software to bring us a capability that we didn't have at the time. Potential." App. 43.

Starburst apparently had no contract vehicle, and Mr. O'Brien brought Logicon in as the contract vehicle, App. 44, so CECOM "would MIPR money to the Air Force to put on this contract." App. 45. Logicon had an I-Case contract with the Air Force which allowed it to lease software pursuant to special offers. App. 184. CECOM chose leasing because it "allowed payments to be spread out." App. 47.

[2] No other CECOM units had the software. App. 38.

Mr. Johnson testified that "[t]here was a need document that was signed." App. 48. The document was signed by Mr. Johnson. App. 49. Mr. O'Brien said the essential need letter was "needed in order to proceed forward."

2. The Order

The Air Force issued the Order. App. 85. As noted, it had three option years and incorporated Leasing Terms and Conditions. In addition to the language quoted above, it contained ways for the government to end the lease early, since funding was not yet appropriated and available for later fiscal years, and the Order specified the Government was not obligated to renew, App. 95.

3. Logicon's Reliance on the Warranty

Barry Bernstein was in charge of Logicon's leasing program. He testified as follows regarding the letter of essential need:

> A. And what the letter of essential need is intended to specify is that the government who acquires the particular product to which the letter of essential need applies represents and warrants to Northrop Grumman that the products are essential to the operation of the entity for the period of which – for the period of time for which the product is being financed or acquired.

App. 193.

The reason Logicon insisted on the letter of essential need was that the Government got a reduced price, the Software was being financed over time and Logicon wanted to be sure the Software would be needed over the entire multi-fiscal year finance period so the government would pay for it over the same period. App. 193. Mr. Bernstein responded as follows to the question of whether Logicon relied on the essential need letter:

> A. Mike, 100 percent. Let me tell you, because I am speaking for Northrop Grumman, because I would not have allowed Northrop Grumman to acquire the software from StarBurst had we not 100 percent known that CECOM was going to continue through this transaction.

App. 287-8. See also App. 293 ("A. What the essential need letter gave us was the representation that the only possibility for the government not continuing with the lease would be nonappropriation of funds. That the essential need – essential need letter provided us the confidence that the government would not attempt to evade or avoid its payment obligations because of a lack of bona fide need. Really what the essential need statement says is that the government does have a bona fide need. They are representing that it does have a bona fide need for the term of the lease.")

4. <u>The Software</u>

Logicon purchased the Software from Starburst, App. 192, 301-2, 312, and it arrived at CECOM's Fort Monmouth office in early November 1999. App. 57. Mr. Johnson signed the material inspection and receiving report indicating "Acceptance of the listed items has been made by me or under my supervision and they conform to the contract." App. 82. The delivery was in the form of CDs and manuals, and, after arrival, they were shipped to Fort Hood "...to see how the software was going to work on the systems in a tactical environment." App. 60. The testing at Fort Hood showed there were numerous problems with the Software; in substance, it did not work in a tactical environment. App. 62-65. Mr. Johnson raised the issues with Mr. O'Brien, who had no satisfactory response. App. 66-67. The Software never got beyond testing and basically failed the Army's test. App. 62-65.

5. <u>The End</u>

CECOM failed to "MIPR" the money to the Air Force for the third option year, so the option for that year was not exercised. App. 68-9. According to Mr. Johnson, CECOM was "nowhere" with the software and "had stopped utilizing the software," App. 70, so he "chose not

to exercise" the renewal option.[3] *Id.* CECOM's failure to exercise the option was not caused by lack of funds. App. 71.

C. The Claim and Decision

1. The Claim

Eventually, plaintiff submitted a timely certified claim of breach of contract to the Contracting Officer on June 12, 2002, claiming, *inter alia*, that there had been a breach of warranty in the essential need letter.

2. The Contracting Officer's Decision, App. 19

The Contracting Officer denied the claim on December 10, 2002, specifically rejecting the various points raised. On the subject of breach of warranty, he stated:

> c. The Essential Use letter you prepared, and told the Government you needed signed in order to obtain financing to perform Delivery Order 5981 did not modify the later bilaterally negotiated, signed terms of P00220 and DO 5981, does not create a warranty, not does it take away the Government's discretion not to exercise an option. Nothing in the language of the Essential Use letter made the contract a multiyear contract.

App. 20-21.

After the agreed dismissal of No. 02-23C, plaintiff resubmitted the certified claim to the Contracting Officer on March 29, 2005, App. 15-18, and, on June 2, 2005, the Contracting Officer adhered to his original decision. App. 25.

[3] Starburst was also acquired by another company which would not be supporting the Software. App. 71.

## IV. ARGUMENT

### A. Breach of Warranty

The Federal Circuit has adopted the following approach to warranties:

> As this court stated in Dale Constr. Co. v. United States, 168 Ct. Cl. 692, 699 (1964):
>
> > *** In essence a warranty is an assurance by one party to an agreement of the existence of a fact upon which the other party may rely; it is intended precisely to relieve the promisee of any duty to ascertain the facts for himself. Thus, a warranty amounts to a promise to indemnify the promisee for any loss if the fact warranted proves untrue. *** [Citations omitted.]
>
> This statement relating to warranties was quoted by the court in Paccon, Inc. v. United States, 185 Ct. Cl. 24, 27-28, 399 F. 2d 162, 166-67 (1968), and is relied upon by the plaintiff in this case as a definition of warranty. In order to prevail on its pending motion, the plaintiff must establish that (1) the Government assured the plaintiff of the existence of a fact, (2) the Government intended that plaintiff be relieved of the duty to ascertain the existence of the fact for itself, and (3) the Government's assurance of that fact proved untrue.

Kolar, Inc. v. United States, 227 Ct. Cl. 445, 447-8, 650 F. 2d 256, 258-9 (1981). Accord, Oman-Fischback Int'l (JV) v. Secretary of the Navy, 276 F. 3d 1380, 1383-4 (Fed. Cir. 2002); Caffall Pros. Forest Prods., Inc. v. United States, 230 Ct. Cl. 517, 527, 678 F. 2d 1071, 1076 (1982); Walter Dawgie Ski Corp. v. United States, 30 Fed. Cl. 115, 126 (1993) ("Walter Dawgie"). "An express warranty does not require formal words of creation." Walter Dawgie, 30 Fed. Cl. at 126-7, citing Everett Plywood & Door Corp. v. United States, 190 Ct. Cl. 80, 92, 419 F. 2d 425, 431 (1969) ("Everett"). In Everett, the court adopted the rule that formal words of warranty were not necessary by analogy to the Uniform Commercial Code, which states that, "it is not necessary to the creation of an express warranty that the seller use formal words such as 'warrant' or 'guarantee' or that he have a specific intention to make a warranty..." Everett, 190 Ct. Cl. at 89, 419 F. 2d at 429, quoting U.C.C. § 2-313(2).

B. The Warranty in this Case

Mr. Johnson had no contracting authority to make a warranty; only the Air Force Contracting Officer did. However, the Contracting Officer did so by incorporating into the Order the Leasing Terms and Conditions, which specifically stated it was "mutually understood and agreed" that the Government has given information "relative to the essential need of the software" and done so "as an inducement for Contractor entering into this Agreement." App. 95. It is significant that the Letter of Essential Need signed and provided to plaintiff by Mr. Johnson predates the Order, as the cross-referenced language "has provided" obviously relates to Mr. Johnson's letter, and the clause in the Leasing Terms and Conditions incorporates it by reference. Mr. Johnson's testimony, discussed above, corroborates he knew the letter was required by Logicon to proceed with the contract (i.e., buy the Software licenses from Starburst and provide the Software to CECOM). Moreover, Mr. Bernstein corroborates that he wrote the required language to meet Logicon's requirements. App. 290. For these reasons, the essential need statement had all of the characteristics of a Government warranty: issued by a Contracting Officer; an affirmation of fact; the Contractor was expected and intended to rely. See Everett, *supra*, 190 Ct. Cl. at 94-5, 419 F. 2d at 433.

C. Breach of Warranty

This case meets the three elements of the test, as summarized in Kolar, *supra*: (1) the incorporated-by-reference letter assured plaintiff of the existence of fact – specifically, that the software was "essential to the operation of ABCS 6.0"[4] and was "integral to the system;" (2) the Government intended that plaintiff be relieved of its duty to inquire into the fact – here, the Contractor was at risk of non-renewal and, before committing money, had to verify the need to assure the Government would use and pay for the three fiscal year term; (3) the fact proved to be

[4] The CECOM systems' acronym.

untrue – here, Mr. Johnson established the Software was simply something which he thought had a "potential" to improve the CECOM's systems. At the time of the Order, CECOM had merely a hope the Software would work; it had never been demonstrated, tested or used. Therefore, it was neither "essential" nor "integral." Once it failed the test, CECOM successfully moved toward another method of meeting its needs. App. 74. Indeed, the Software's failure shows exactly why the warranty was necessary to the Contractor; if the Software was merely a hope and a test, the failure of the test would lead to a Government decision not to exercise its renewal options.

D. Reliance

The Kolar test does not have a reliance element; however, the record establishes without contradiction that Logicon relied on the warranty in the essential need letter. Mr. Bernstein explained in detail why this was so. App. 290-293. Nothing in the record does (or could) contradict him.

E. Damages

The foregoing establishes breach of contract. Damages are the contract price less any saved cost of performance. See Municipal Leasing Corp. v. United States, ____ Ct. Cl. ___ (1986) (No. 428-82C) (copy in Appendix at App. 321. This case contains an analysis of breach of contract damages in a similar lease context.). The Federal Circuit takes the following position on measure of damages in a breach of contract case:

> As a general rule, when there has been a breach of contract, the non-breaching party is entitled to an award of damages that will place it "in as good a position as [it] would have been in had the breaching party fully performed." Wells Fargo Bank, N.A. v. United States, 88 F.3d 1012, 1021 (Fed. Cir. 1996). This rule sets the floor for damages, by ensuring that the non-breaching party suffers no pecuniary loss as a result of the breach. It sets the ceiling for damages as well, because the non-breaching party is "not entitled to be put in a better position by the recovery than if the [breaching party] had fully performed the contract." Miller v. Robertson, 266 U.S. 243, 260, 69 L. Ed. 265, 45 S. Ct. 73 (1924).

Rumsfeld v. Applied Cos., 325 F. 3d 1328, 1336 (Fed. Cir. 2003). See also James S. Lee & Co. v. United States, 9 Cl. Ct. 322, 323 (1986). In order to put the prevailing breach of contract plaintiff in a position equal to the one it would have been if the contract had been performed, any costs of performance saved due to the breach must be subtracted from the contract price. See White v. Delta Constr. Int'l, Inc., 285 F. 3d 1040, 1043 (Fed. Cir. 2002). In this case, there were no saved costs of performance, as plaintiff bought the Software from Starburst at the outset.[5]

Mr. Johnson's testimony makes clear that there was no shortage of funds impacting the Army's decision not to continue the lease. CECOM decided not to exercise the third renewal option because the test failed; if, as warranted, the software was "essential" and "integral," the options would have been exercised for the third and fourth option years, as both the need and money were present. The unpaid contract price was $570,000 ($285,000 for each fiscal year). App. 94. That is the measure of damages, plus CDA interest.

F. Summary Judgment Standards

The foregoing establishes that there is no genuine issue as to any material fact. The movant's burden is to show the absence of any genuine issue, Meade v. United States, 27 Fed. Cl. 367, 369 (1992), and plaintiff has done this essentially through the testimony of the government's own witness and the stipulated documents.[6] There is nothing in the record to contradict Mr. Johnson's testimony about the Software or his testimony that he signed the Essential Need Letter.

---

[5] There were maintenance costs in the later years, and maintenance was not provided in years 3 and 4. However, maintenance is separately stated in the Order (App. 94) at $179,760 per year, and is ***not*** sued for here.

[6] The parties have stipulated to the contract documents. App. 158.

## V. CONCLUSION

The court should enter the attached order granting plaintiff summary judgment.

Respectfully submitted,

/s/ Michael E. Geltner, Esq.
Michael E. Geltner, Esq.
Geltner & Associates, P.C.
10 E Street, S.E.
Washington, D.C. 20003
T: (202) 547-1136
F: (202) 547-1138

*Attorney for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the Plaintiff's Motion for Summary Judgment and Memorandum in Support of Motion for Summary Judgment was sent this 15th day of November, 2006 by electronic filing transmission to:

J. Reid Prouty, Esq.
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Attention: Classification Unit, 8th Floor
1100 L Street, NW
Washington, DC 20530

/s/ Michael E. Geltner, Esq.