IN THE UNITED STATES COURT OF FEDERAL CLAIMS

NORTHROP GRUMMAN INFORMATION TECHNOLOGY, INC., Plaintiff, : No. 05-595C (Sr. Judge Smith)

vs. : DEPOSITION OF: JOSEPH E. JOHNSON

THE UNITED STATES, Defendant.

COPY

TRANSCRIPT of the stenographic notes of the proceedings in the above-entitled matter, as taken by and before SUSAN M. STYRON, a Certified Shorthand Reporter and Notary Public of the State of New Jersey, held at U.S. Army, Ft. Monmouth, New Jersey, on Wednesday, March 1, 2006, commencing at 10:40 a.m.

A P P E A R A N C E S:

MICHAEL E. GELTNER, ESQ.
Number Ten E Street, S.E.
Washington, D.C., 20003
Attorneys for Plaintiff

U.S. DEPARTMENT OF JUSTICE
BY: J. REID PROUTY, ESQ.
1100 L Street N.W.
Washington, D.C., 20038
Attorneys for Defendant of Record

AIR FORCE LEGAL SERVICES AGENCY
COMMERCIAL LITIGATION DIVISION
BY: JOHN T. LAURO, ESQ.
1501 Wilson Blvd., Room 606
Arlington, Virginia 22209
Agency counsel

U.S. ARMY COMMUNICATIONS-ELECTRONICS
COMMAND (CECOM)
BY: KIM SAWICKI, ESQ.
Office of Chief Counsel
Ft. Monmouth, New Jersey 07703
Agency counsel

INDEX


| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| JOSEPH E. JOHNSON | | | | |
| BY MR. GELTNER | 4 | | | |


EXHIBITS


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Inspection and receiving report | 11 |
| 2 | Letter of essential need | 23 |
| 3 | Contract documents | 27 |
| 4 | Contract documents | 27 |
| 5 | Contract documents | 27 |
| 6 | Contract documents | 27 |
| 7 | Memo dated 1/28/00 | 36 |


DOCUMENT REQUESTS

PAGE(S)

NONE OFFERED

NOTED OBJECTIONS PAGE(S)

NONE OFFERED

JOSEPH E. JOHNSON, residing at 1359 White Oak Bottom Road, Toms River, New Jersey, having been duly sworn by the Notary Public, testified as follows:

DIRECT EXAMINATION BY MR. GELTNER:

Q Mr. Johnson, I'm going to ask you some questions. I'm sure that your lawyers have given you some instructions, I'll just give a couple. One, she's the person that really counts, so your responses should be audible and directed towards her. I don't count. They count more than I do. When I ask questions, try to wait until the end of the question. A lot of times they twist around and I get confused in the middle and I'm still going. If you do that, the record will look better. And, ultimately what's going to happen from here is she's going to type up a transcript, and it will look better if we each wait for each other to finish.

What is your current employment, Mr. Johnson?

A I work for the U.S. Army for the program executive officer for command control communications tactical.

Q Are you a civilian?

A Yes.
Q How long have you worked for the U.S. Army?
A Twenty-three years.
Q What do you do?
A Right now I'm an NH4 engineer out of the system engineering office within PEO C3T.
Q C3T?
A Yes, command control communications tactical.
Q How long have you worked in this position?
A For the PEO, since about '89. The current position, we just reorganized, so it hasn't been too long.
Q What relationship does this organization have to CECOM?
A It's, the PEOs are really tenant organizations, I guess. But right now they, the CECOM commander, the CE-LCMC Commander General Mazzucchi is the PEO C3T.
Q Can you take us back to before 23 years ago when you started being employed by the Army, what's your previous training?
A I have a Bachelor's Degree in

electronic engineering. I worked in industry for approximately two years prior to joining the government. Graduated from Trenton State in 1980. And subsequent to that, while working for the government pursued and received master's degrees in electronic engineering from Fairleigh Dickinson University, and a masters in management, technology management out of Stevens Institute of Technology.

Q If you had to describe your training or specialty what would you say it is?

A Within the PEO?

Q Yes.

A Right now, system engineering. It's a staff position overseeing the system perspective of programs that are under the development of the PEO within program manager shops.

Q I'd like to go back to 1999, because that's when all this stuff happened. What was your position then?

A My position then was chief of the horizontal technology integration office, also known as HTIO. And that was also a staff organization, primarily responsible for looking horizontally across programs and integration

issues across those programs.
Q What kind of programs?
A In particular they're the battle command systems that are developed, battle command and communication systems that are developed within the PEO to include such programs as fire support, maneuver control, intelligence, electronics warfare, as well as communication systems.
Q These various programs, are they in the Army alone, or Defense Department-wide?
A They're primarily Army systems, yes.
Q Are you familiar with the software that's the subject matter of this lawsuit?
A Yes.
Q Where did that fit in the listing of horizontal programs?
A The software itself did not fit within those programs, per se. That software was to be used with some of that programs equipment to bring a multicast capability to the communications system.
Q I need to you explain that a little bit more.
A The systems that I'm describing

interconnect with one another to form a system of systems. And the systems are deployed at different echelons within the Army, and they communicate with one another. The multitask software was to improve the efficiency of those communications among those systems.

Q Which particular systems are you talking about?

A Maneuver control system, AFATDS, which is the fire support system. ASAS, the Intel, combat support system.

Q So I've got basically five; maneuver control, fire support, Intel, combat support. Any others?

A Yeah, there's also at the time FAAD C squared, which is the air defense element of that system of systems.

Q These are each separate systems, but they communicate with each other?

A They interact, yes.

Q How do they interconnect, or how did they? Let's take 1999 before the acquisition of the software. And, just for the record, I'll describe the software as Starburst Omnicast software. Is that accurate?

A Yes.
Q When I use the words "the software," I'm basically talking about the Starburst Omnicast, which is the subject of the Herman dispute.
So the question was, could you take us back to the period immediately before the procurement of the software and tell us how these systems were interconnecting?
A As I understand it, and remember it, those systems would interconnect in a point-by-point manner. The message would go out of one and be sent to another individually.
Q And were they able to communicate with each other in that way?
A Yes, I believe so, yes.
Q Okay. Now, what was the software in dispute supposed to do to change that, if anything?
A The multicast software allowed for more efficient use of bandwidth between those systems, allowing you to use less bandwidth to communicate the same amount of data, I guess simultaneously.
Q Were you using the concept of point-to-point before, was the software in

dispute supposed to change that?
A I believe it was to improve it. It was to improve the bandwidth efficiency of the prior manner of the data distribution, yes.
Q What, if anything, was your interaction with the acquisition of the software in dispute?
A I was, I guess as chief of the HTIO office, was approached by Rick O'Brien at the time with this software capability that he felt was, would pose an improvement for data communications among our systems.
Q Who is Rick O'Brien?
A Rick O'Brien. He was a representative from Starburst.
Q Had you had previous dealings with either Rick O'Brien or Starburst?
A No.
Q Do you remember what his explanation was?
A No, no. Upon our first meeting you mean?
Q Well, did you or people under you seek Starburst out, or was he making a marketing call, in effect?
A Yeah, I believe that's the way it

occurred, yes.

Q Why don't you answer that again? I asked you an either/or.

A Could you repeat the question?

Q Yeah, now that I've got an answer. Did the acquisition start with Mr. O'Brien making a marketing call?

A Yes, to the best of my recollection that's how it started. It was in my office, yes.

Q Do you know about when this was?

A Not accurately. Sometime in '99, I guess, mid-'99. But that's not a firm date.

Q If I tell you that, well, maybe we can fix a date. We're just asking for best recollection on this. If you go a little bit down to 68 I think you'll find what I think is the material inspection and receiving report.

MR. GELTNER: We'll mark this as Exhibit 1.

(Inspection and receiving report, two pages is marked Exhibit 1 for identification.)

Q Mr. Johnson, I've just shown you Exhibit No. 1. Maybe you can tell us for the record what it is.

A It's a material inspection and

receiving report.
Q Do the two pages belong together?
A As far as I can tell, yes, the numbers appear to agree.
Q Okay. Now, I gave you Exhibit 1 when we were talking about when Mr. O'Brien's sales call came in in relationship to the installation. Does this help you at all in terms of timing?
A This is a material receiving report showing November of '99, and I said maybe we had began discussions mid-year of '99, so maybe that is close, six months before this period. Could be.
Q What do you remember happening after Mr. O'Brien's sales communication?
A Which communication? His initial office visit?
Q Yes. Did he start with an office visit?
A I'm assuming that. I'm assuming, it could have been a phone call. But I don't have any specific recollection of meetings leading up from there, other than I know we had discussed, I guess the potential of this software.
Q We being who?

A Primarily Mr. O'Brien, myself and perhaps some people from my technical staff, but I couldn't say who.
Q Do you remember the discussions or anything about them?
A No, other than I might characterize them as a marketing pitch type of thing. But no specifics, I have no recollection of the specific meetings.
Q Was the software in use within your, any of the units under your control before this pitch by Mr. O'Brien?
A He had, I believe had some dealings with one of the program management shops within PEO. Not, they were not under my purview, but they were within the PEO.
Q So you think he had dealings with just marketing, or do you know whether any of the software was actually installed?
A I don't recollect when anything was installed. He may have sold some software to PM, but I have no clue what the status of that was, whether it was being employed at the time.
Q Do you have any idea whether it was the same software or a different software?

A I hesitate because it might have been a later version, I don't know.

Q So to get that one a little clearer. You said it might have been a later version. Do you think the version that he was trying to sell you was the later version, or the version that he may have sold to the other unit?

A I would assume, I believe my visit was after or subsequent, maybe to the PM. So I don't know whether it was the same software, as what your question was, I can't state that it was, I just don't know.

Q Did you get to the point where somebody made a decision to procure the software?

A Within my office?

Q Anywhere.

A Yeah. Within HTIO, yes, we did get to that decision.

Q Can you describe how that came about? I guess what I'm interested in is what process did you go through and how is it documented?

A I cannot recall the specifics of the process, other than Mr. O'Brien presenting a marketing pitch, I guess. And there were obvious, I would assume there was ensuing

discussions, and that led to an ultimate contract. Point-by-point specifics between those two, beyond our discussions with Rick, my discussions with Rick, and some support, I guess from our contracting office within the PEO, that's about all the detail I can remember.

Q Was there a standard process in effect in 1999 that you had to go through to justify an acquisition like this?

A I don't believe so.

Q Can you describe what your understanding was of how the software was going to be working when you made the decision on the procurement?

A What the intended purpose of the software would be?

Q What was the intended purpose, and, two, how was it understood to be achieving that purpose? I think you've already testified as to the former, but I'd like to make it as clear as possible.

A The purpose of the software was to bring a multitask capability across these systems, to improve bandwidth utilization, efficiency utilization.

Q I think you explained before about improving the bandwidth efficiency. Just what was the multitask capability that you thought you would be getting from the software?

A From my perspective, I felt it was going to allow us to pass data more efficiently.

Q Is that what you mean by the multitask capability?

A (Witness nods head.)

Q You should verbalize so she gets it?

A Yes, sorry.

Q Okay. Was there, if you remember, was there a demonstration or literature or internal test utilization, or anything that caused you to reach the conclusion that this software would or would not do what you wanted?

MR. PROUTY: What time are you talking about?

MR. GELTNER: I'm still in 1999 at this pre-procurement.

A There might have been some viewgraph presentations that Rick O'Brien presented. That's about it, that's all I recollect, though.

Q Is it common in software procurements to do a demonstration?

A Prior to going to contract, you mean?

Q Yes.

A I can't answer that question. In this case it was a pre-contract, was just a review, I believe. There was no pre contract demonstrations or anything that I remember at all. I just don't remember.

Q I asked a bit of this again, but I just want to get the chain of command right. Were you a decision maker or recommender for the procurement?

A I was the decision maker.

Q Did somebody make a recommendation up to you internally?

A Someone from my technical staff probably gave me an assessment. I say probably because I can't state a point in time when I actually remember that assessment.

Q Do you remember anything at all about it?

A No. It would be a guess, and I -- about the assessment, you mean?

Q Yeah. I'm really interested in the decision-making process leading up to your sign-off to go forward.

A From my perspective, I think based on what we had discussed across the table and in speaking with Mr. O'Brien, that there was a potential for the software to bring a capability that we didn't have at the time. Potential.

Q Do you remember what the process was after you made the decision to procure the software?

A Part of the process, I guess, at that point was Mr. O'Brien identifying mechanisms to go to contract under.

Q Do you remember anything about that process?

A No, not specifically. You know, he was, I guess he brought to the table the mechanism, or at least the potential mechanism.

Q Are you aware that there was no contract between Mr. O'Brien's employer, Starburst, and the U.S. government for the software?

A That there was none?

Q That there was none?

A No, I was not aware of it. At the time I was not aware of that, no.

Q Let me try the question another way, I

might be confusing you. I believe the ultimate party that contracted with the government to supply this software in dispute was Logicon; is that correct?

A Yes.

Q And you didn't believe at the time that Starburst was identical with Logicon or an affiliate of Logicon, did you?

A The question again, last part?

Q I guess the question I'm after is how did it come about that Mr. O'Brien was representing Starburst, but the contract was between the government and Logicon?

A I think he had done that before in other instances.

Q Is this what you were talking about when you said that Mr. O'Brien identified the mechanism to go to contract?

A Yes.

Q So, in effect, Mr. O'Brien brought Logicon in as the contracting vehicle?

A I certainly did not do it, yes.

Q Does your shop and you personally have anything to do with the contracting side, or did you in 1999?

MR. PROUTY: Ambiguous as far as what you mean by contracting side?

MR. GELTNER: Yes, that is a bad question, let me try another way.

Q The acquisition of the software ended up as a contract, I believe. And the question really is, what was the relationship of your office to the office that issued the contract? I just really want to get on the record how the process worked in 1999.

A I'm not aware of a firm contractual relationship. We would MIPR money to the Air Force to put on this contract.

Q Maybe you could describe the MIPR process for the record, to the extent you know.

A I'm not the contracting guy. I believe it's an interagency movement of dollars, if another agency has a contract and you're utilizing it for any reason, you can MIPR money over.

Q So by MIPR, you mean the money is actually yours, but another agency is issuing the contract, so they have to have the money so you are, in affect, allowing them to use your money?

A Yes.

Q Were you involved in the process of getting money that could be MIPR'd over to the Air Force?

A Yes, to the extent that it was HTIO funding that was used.

Q Do you remember how you got the funding?

A Not specifically, no. Just part of the overall budget.

Q So this, is it accurate to say that this was essentially software that was going to be used by the Army, but the Air Force's involvement was basically as a contracting shop?

A I believe that was the situation, yes.

Q Did you know anything about the contract situation at the time?

A Not to the complexity and detail I know today. My recollection is it was a mechanism that was put in place. And much beyond that, I don't have a recollection of the details.

Q You say you know more now. What do you know about it now?

A Well, just the mechanism and a little more detail of what the process ensued than I did at the time.

Q What specifically?
A What we just described.
Q I believe that there was a decision made to use leasing versus outright purchase. Do you have any recollection of that?
A I know leasing was the mechanism used. I don't have a recollection of the intricacies of the lease at the time, other than that was the mechanism.
Q Do you know how or why the decision was made to use leasing versus purchase, or any other reason?
A I believe that allowed payments to be spread out.
Q Do you know any more than that?
A That was, in essence, what I understood at the time, I guess.
Q Do you have a recollection as to why it was desirable to have payments to be spread out?
A No. I'd be supposing.
Q Your no looked equivocal, so I would let you finish the thought.
A I'm just thinking.
Q If you want to take the time or if any documents can help you, take your time.

A Other than, you know, pushing payments over time, I don't know whether it was because -- I don't know at the time. Full funding was maybe not there at the time to purchase it, but that's, I can't say that that's the definite reason why we came to that mechanism.

Q Do you remember anything else about the issuance of the contract? Just the process of getting from your decision to procure the software to the termination to -- let me start the question again.

If you take the point where you decided that you wanted to go ahead with the procurement and then you started the MIPR process going on, going forward, do you have any recollection of anything else that occurred prior to the time that the contract was finally issued?

A Yes. There was a need document that was signed.

Q Let's take a look at, I have a couple of copies in the stack, but I just pulled out Bates 302.

(Letter of essential need is marked Exhibit 2 for identification.)

Q Could you take a look, Mr. Johnson, at

what was just marked as Exhibit No. 2?
A Yes.
Q For starters, let me ask you to identify the document you're looking at, Exhibit No. 2.
A It's a letter from PEO C3S, subject letter of essential need, three paragraphs, signed by myself.
Q Just so we get a complete record, can you tell us what PEO C3S?
A That's program executive office for command control communication systems.
Q And there's a signature on the bottom; is that yours?
A Yes.
Q There's a date on the upper right hand. Do you think that's accurately dated?
A I have no reason to think that it is not.
Q And can you tell us how this document came about, what you remember of it?
A This document came about, I guess, towards the end of discussions. And this came from, I know, it looks like, I don't recognize the name, I don't recognize the name on top, but

it was from either Mr. O'Brien or someone at Logicon. And at the time I believe it was stated they needed this in order to proceed forward.

Q Do you know who told you that?

A I would say it was Mr. O'Brien, to the best of my -- remember, he was my primary interface.

Q The name on the top, Jondel Bandeau (phonetic), is that the one you said you didn't recognize?

A Yeah, I don't recall that name.

Q Do you recall a Barry Bernstein?

A Yes, I do, but much later than this.

Q Did you have any communication, if you remember, in this pre contracting period with anybody from Logicon?

A Not that I remember by name, not that I can recall.

Q Do you remember if Mr. O'Brien gave you any further explanation as to the need for Exhibit 2? I think you said they needed this. Do you remember an explanation as to why they needed it?

A To the best of my knowledge, again, this goes way back, six years, I believe Mr., and

this memory may actually be to something else, not even this, but I remember something to the effect that, obviously to get this in place quickly, to get it counted as revenue for Starburst. I mean, that's way back, it might not have even been in relationship to this letter of essential need, but I have a recollection of him saying that.

Q Were you dealing with any individuals, if you remember, at the Air Force contracting shop at this time?

A Not directly, I don't believe so. I cannot remember dealing with anyone directly almost beyond Rick O'Brien at this point in time of this.

Q Do you know if you had any interaction with the contracting shop at all in relationship to Exhibit No.2?

A The Air Force contracting shop?

Q Yes, the Air Force contracting shop.

A I don't believe so.

Q Have you ever seen the contract that initiated the procurement of the software in dispute?

A I'm sure I have at some point.

Q I'm going to show you a document. Give me a minute. We can go off the record a minute while I shuffle papers.

(A discussion is held off the record.)

(Contract Documents are marked Exhibit 3 through 6 for identification.)

Q Mr. Johnson, the court reporter has marked Exhibits 3, 4, 5 and 6, which I'll characterize as contract documents. I'd like you to take a look at them in, I guess in the sequence in which they've been marked. And so take a look at No. 3 first, and tell us if you know anything at all about it?

A I don't recognize it off the bat, other than the contract award amount of $100,000, I think the first payment that was made. I have to go back to Exhibit A where I think I saw it.

Q Just for the record, this is a document that near the top says, Contract No. FO162094D0002 and Order No. 5981, and it starts with Bates No. 95, and runs through Bates No. 108, although the last page doesn't seem to be a contract page. Could you take a look at No. 3, and, next question is, does your unit appear there anywhere?

A I don't see it anywhere on the first page. Do you want me to go page by page?
Q Just if you recognize anything that relates to your office.
A Just on Page 96, customer is U.S. Army CECOM in one sentence.
Q That's how it ties into your office?
A Yes, indirectly. The customer was identified as CECOM, it's actually the PEO. But, yes, that's the U.S. Army entity here at Ft. Monmouth.
Q Right after the spot you identified is something called Registered User No. AR007002. Do you know what that is?
A Other than an AR normally meaning Army reg, I don't know what that is.
Q Could you take a look at No. 4 and see if that one has any significance to you? What we just marked as Exhibit No. 4.
A I don't recognize this reading through it. It says, "This supplemental agreement is entered into pursuant to authority."
The question, I'm sorry?
Q Before I ask you a firm question, just let me state for the record that this is a

document dated October 20, 1999, entitled Amendment of Solicitation/Modification of the Contract, and has Bates Nos. 60 through 67.

I guess my question is, does this have any meaning to you, or is this not your bailiwick?

A I have not seen this before. Well, I don't remember seeing this. The contractual terms. When you say not my bailiwick, I'm not sure what that means.

Q Did you have anything at all to do with the negotiation, establishment, or anything of the like of the contract terms?

A Directly with the Air Force, you mean?

Q Or with anybody?

A Not that I recall, other than the basic agreements, I guess, of the payments or whatever. The specificity in these things I don't recall.

Q Let me take it back. What I'm trying to decide is whether or not I'm wasting your time asking you about a lot of contract stuff. You told me you made the decision to procure the software, that you MIPR'd the money over to the Air Force, and that there was a decision made to use leasing versus purchase. And did you have

any more interaction or make any more decisions related to the contract beyond those?
A I don't believe so, I don't believe so.
Q Okay. And do you have any familiarity at all with the contract documents? The first two you basically said you didn't, if that's a fair characterization.
A Correct. Yeah, to the best of my knowledge, at the time, yeah, except for the basic tenets maybe, perhaps.
Q For example, let's take a look at No. 5. That bears --
MR. PROUTY: You mean Exhibit 5?
MR. GELTNER: Yes, Exhibit No. 5.
Q It bears Bates No. 109 through 130. And that one on the first page has Order No. 6022, which is different from Order No. 5981, which is on Exhibit 1.
And my basic question is, do you have any idea why that is different?
A No. Had you not pointed it out to me, I probably wouldn't have tied the two together.
Q Okay. I'm just trying to establish whether we're wasting time, so I can cut off asking you questions about the contract

documents. So they're marked, but I'm not going to ask you any more questions about them.

A Okay.

Q Unless you want me to. You seem to be anxious, you can't get your hands off of them.

A No, I just want to make sure that there's not something in here that takes a glaring shot in the face to me that I would say that I remember.

Q Yes, take your time.

A Okay.

Q Does the okay mean that nothing glaring sticks out?

A Yes. It's contracts language that I'm not sure I can add much to.

Q Do you have any recollection, and you can take a look at No. 3, first page, Exhibit No. 3, first page, do you have any recollection as to why the award amount was $100,000?

A No, I do not. I could hypothesize, but it would be nothing more than that.

Q Do you have any idea whether it has anything to do with the fact that the delivery was in the middle of the fiscal year?

A No.