CERTIFIED COPY

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

NORTHROP GRUMMAN )
INFORMATION TECHNOLOGY, INC. ) Case No. 05-595C
Plaintiff, ) (Senior Judge Smith)
vs. )
THE UNITED STATES, ) Pages 1-138
Defendant. )
)

DEPOSITION OF:

BARRY J. BERNSTEIN
WEDNESDAY, AUGUST 2, 2006
10:27 A.M.

REPORTED BY:

JARDENE L. PLATT,
RPR, CSR No. 3724



LEGALINK® A MERRILL COMPANY
1363 Donlon St Suite 8 Ventura, CA 93003 tel (805) 644-1986 tel (800) 438-2226 fax (805) 644-6582
20750 Ventura Blvd Suite 205 Woodland Hills, CA 91364 tel (818) 593-2300 tel (800) 826-0277 fax (818) 593-2301
www.merrillcorp.com
GLOBAL COURT REPORTING · LEGAL VIDEOGRAPHY · TRIAL SERVICES

Deposition of BARRY J. BERNSTEIN, taken on behalf of the Defendant at 300 North Los Angeles Street, Los Angeles, California, on WEDNESDAY, AUGUST 2, 2006, at 10:27 a.m., before JARDENE L. PLATT, RPR, CSR No. 3724.

APPEARANCES OF COUNSEL

FOR THE PLAINTIFF:

GELTNER & ASSOCIATES, PC
BY: MICHAEL E. GELTNER, ESQ.
Number Ten E Street, S.E.
Washington, D.C. 20003
(202) 547-1136

FOR THE DEFENDANT:

UNITED STATES DEPARTMENT OF JUSTICE
BY: J. REID PROUTY, ESQ.
1100 L Street, N.W.
Classification Unit, 8th Floor
Washington, D.C. 20530
(202) 305-7586



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

# I N D E X


| EXAMINATION | PAGE |
|---|---|
| By Mr. Prouty | 5 |
| By Mr. Geltner | 120 |
| By Mr. Prouty | 124 |
| By Mr. Geltner | 128 |
| By Mr. Prouty | 135 |


## E X H I B I T S


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Email string ending September 22, 1999 to Barry Bernstein from Guy Speers, 000551. | 29 |
| Exhibit 2 | Memorandum for Logicon Information Technology Group, 000302. | 33 |
| Exhibit 3 | September 29, 1999 letter to Barry Bernstein from Edward M. Durkin, 000482 to 000483. | 44 |
| Exhibit 4 | March 13, 2000 letter to Barry Bernstein from Bill Andrews, 000450. | 56 |
| Exhibit 5 | Email string ending 3-15-00 to Joseph Johnson from Randy Korich, no Bates stamps. | 64 |
| Exhibit 6 | Email string ending March 21, 2000 to Margaret Higgins from Gerald A. Soltis, no Bates numbers. | 65 |

E X H I B I T S (Continued)


| NO. | DESCRIPTION | PAGE |
| --- | --- | --- |
| Exhibit 7 | 12-22-00 email to Dorothy Priest from Guy Speers, no Bates numbers. | 70 |
| Exhibit 8 | April 23, 2001 email to Guy Speers, et al., from Barry Bernstein, 000788. | 84 |
| Exhibit 9 | March 8, 2001 email to Barry Bernstein from Zacahry Pepin, 000782. | 96 |
| Exhibit 10 | July 3, 2002 letter to Harry Bryan from John del Bando, 000461 to 000465. | 102 |
| Exhibit 11 | Email string ending October 17, 2002 to Jeffrey C. Nolan, et al., from John del Bando, 000456 to 000459. | 106 |
| Exhibit 12 | October 17, 2002 memorandum for John del Bando from Harry M. Bryan III, 000454 to 000455. | 111 |

LOS ANGELES, CALIFORNIA

WEDNESDAY, AUGUST 2, 2006; 10:27 A.M.

BARRY J. BERNSTEIN,

having been first duly affirmed under the penalties of perjury, was examined and testified as follows:

EXAMINATION

BY MR. PROUTY:

Q. Good morning, Mr. Bernstein.

A. Good morning.

Q. We just met a few moments ago. I am Reid Prouty. I am the attorney for the government in the case of Northrop Grumman Information Technology versus U.S. That's the Court of Federal Claims.

Could you please state your full name for the record.

A. Yes. Barry J. Bernstein.

Q. And, Mr. Bernstein, where do you currently reside?

A. At 23521 Ladrillo Street, Woodland Hills, California 91367.

Q. Thank you very much.



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

Mr. Bernstein, have you ever been deposed before?

A. No, I have not.

Q. I'm sure your attorney has probably gone over some of this with you.

A. Yes.

MR. GELTNER: Not really.

BY MR. PROUTY:

Q. I will go over a few things with you.

A. All right.

Q. The first thing is that if I ask you any question and you don't understand the question, either because I have mumbled or because, you know, I used a phrase or words that just didn't make any sense to you, please don't guess what I am asking. Just let me know there is a problem and we will address that.

Is that all right?

A. Absolutely.

Q. Great. And as you have noticed, Ms. Platt here, the court reporter, is taking down everything we are saying, but what she doesn't take down is nodding of heads and necessarily the meanings of things like "uh-huhs" and "yuh-huhs." So if there is a question out there, I need you to sort of say, "yes" or "no," or answer the question as best you can.

Is that okay?

A. Absolutely.

Q. Great. If for any reason as we go on in the deposition, for comfort reasons or for whatever reason it would be a good time to take a break, you let me know and we will take a break at the next reasonable time. I tend to do it about every hour or so. I don't expect us to be here all day long today.

A. All right.

Q. But sometimes you get wrapped up in things and you don't do it. Just let me know and we will take a break as soon as we can.

A. All right.

Q. And is there any reason today you can't be deposed?

A. No.

Q. Are you under any medications of any sort that might affect your ability to remember things or be deposed today?

A. No.

Q. And, Mr. Bernstein, did you do anything to prepare for this deposition today?

A. No, I did not.

Q. Could you give me a background on your educational background.



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

A. Yes. I have a degree from the University of Denver, Bachelor's degree, in international marketing. I have a law degree from the University of Denver Law School. I have a Master's in finance from the University of Colorado.

Q. So you understand very well what a deposition is all about, given a law degree, I would imagine. Can you tell me when you got your degree -- your Bachelor's in Denver?

A. Let's see. I believe the Bachelor's was in 1967.

Q. And when did you get your JD?

A. 1971, I believe.

Q. And your Master's?

A. 1983.

Q. And are you a member of any bar right now?

A. No, I'm not.

Q. Were you ever a member of any bar?

A. No, I was not.

Q. Could you give me your employment history from after you got your undergraduate degree.

A. Let's see. Starting from college forward?

Q. Yes, please.

A. Let's see. I was first employed by System Development Corporation. System Development

Corporation was merged with a company called Unisys Corporation.

Q. Sure.

A. I was their -- the director of contracts.

Q. When was this?

A. This was from about 19- -- right after law school, about 1971 through 1976.

Q. Was -- what kind of contracts were there?

A. Strictly government contracts. Fully government contracts.

Q. What kind of service or products were you providing?

A. Primarily information technology products. Software, hardware products. With System Development Corporation, I was involved with the refurbishment of the NORAD Cheyenne Mountain complex in Colorado Springs, Colorado. From System Development Corporation, I then worked with a company called Ball Corporation, B-A-L-L.

Q. Yes.

A. Ball is a diversified manufacturing company. I was involved with their aerospace division. I was then --

Q. What did you do -- when you say you were involved in the aerospace division, were you doing



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

contract work?

A. I was doing -- I was in charge of contracts, finance and marketing --

Q. Okay.

A. -- for Ball. I was then promoted at Ball to vice president of administration and at that point I was in charge of purchasing contracts, finance, personnel and facilities. And I worked for Ball from 1976 to 1983.

Q. Was this in Colorado or was this --

A. This was originally in Colorado. In Boulder, Colorado. I was then transferred in -- excuse me. I worked for Ball from 1976 to 1986.

Q. Okay.

A. In 1983, I was transferred to Los Angeles. I was involved in acquisitions and divestitures of companies.

Q. Okay.

A. We acquired a company in Irvine, California.

Q. At this time when you were doing the acquisitions -- and divestitures, was it?

A. Yes.

Q. -- were you doing government contract work at the same time?



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

A. Yes, I was. Yes.
Q. Please continue.
A. And in 1986, I left Ball Corporation. I went back to System Development Corporation, but at that time it was part of Unisys. So I will use Unisys and System Development Corporation synonymously.
Q. Sure.
A. I was there, director of contracts for Unisys, from 1983 to 19- -- excuse me -- from 1986 to 1989.
Q. All right.
A. In 1989, I then went to work for a company called Loral Corporation, L-O-R-A-L, which is a electronics corporation out of New York. At that point I was director of international contracts for Loral from 1989 to 1995.
Q. And although Loral is out of New York, were you in New York or in --
A. No. I was in California.
Q. Okay.
A. Actually, Loral acquired Ford Aerospace Corporation and I was affiliated with Ford Aerospace Corporation, so I was part of that acquisition.
And let's see. In 1985, I took a leave of absence for one year and went to Israel. Spent a year


LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

in Israel.

1986, I returned to the United --

MR. GELTNER: You are in the '90s now.

THE WITNESS: Excuse me. Excuse me.

BY MR. PROUTY:

Q. Yes.

A. In 1995, I took a leave of absence from October of 1995 until May of 1996.

Q. Yes.

A. I then returned to the United States in May of 1996 and was employed by a company called Logicon.

Q. Yes.

A. And Logicon was then immediately acquired by Northrop Grumman.

Q. When you were first hired by Logicon, what were your duties?

A. I was hired as the manager of subcontracts.

Q. Okay.

A. Now, as manager of subcontracts, my responsibilities were to work on an IDIQ contract, that's an indefinite delivery/indefinite quantity contract.

Q. Yes.



*LegaLink, a Merrill Communications Company*
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

A. And my job was to establish strategic alliances with about 65 to 75 major information technology suppliers.

Q. Sure. Strategic alliance, I believe, is a term of art. What do you mean by that?

A. It was really establishing acquisition procedures with these companies, establishing relationships where we bought hardware and software products, primarily software products, at significant discounts. Negotiating the discounts, negotiating the agreements with the suppliers. Negotiating the terms and assuring proper performance by those suppliers.

Q. Was the idea in general that as the prime contractor, somebody would go to you and ask for a product and then your job as the head of subcontracting was to find another company that would provide the part to you to provide to whoever was contracted with you?

A. I believe that's a reasonable interpretation.

Q. Okay. So you were head of subcontracting, you went to Logicon --

A. Right.

Q. -- and you said almost immediately after you got there, it was acquired by Northrop Grumman?

A. Right.

Q. Is that Northrop Grumman, period, or Northrop Grumman Information Technologies, do you know?

A. I do know.

Q. Okay.

A. It was acquired by Northrop Grumman and at the time of acquisition in 1996 -- excuse me. No. The acquisition was in 1997. I believe it was in May of 1997. At the time of the acquisition in May of 1997, Logicon was a wholly-owned subsidiary of Northrop Grumman Corporation.

Q. Yes. Okay. Did the acquisition of Logicon by Northrop Grumman change your duties in any way?

A. No. Not initially.

Q. What happened next to your duties?

A. Then in about 19- -- the beginning of 1999, working for Northrop Grumman, I worked for Northrop Grumman Information Technology and I was promoted to director of licenses and leasing.

Q. Okay. I am a little confused. There seems to be some confusion in this case about the names and the relationships with Northrop Grumman, Logicon and Northrop Grumman Information Technology.



*LegaLink, a Merrill Communications Company*
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

A. Okay.

Q. Did Logicon change its name?

A. No.

Q. You said, "working for Northrop Grumman." Did you mean that you were working for Logicon, which was owned by Northrop Grumman, or did you mean that you changed who you worked for?

A. The former.

Q. Okay. How did that come about?

A. Well, during my employment with Logicon/Northrop Grumman, the Logicon entity went through a number of transitions and the transitions were only transitions relative to name changes --

Q. All right.

A. -- and reporting functions.

Q. All right.

A. The requirements of the Logicon entity per se remained the same. It was only, as I said before, the name change and the reporting functions that changed.

Q. So at some point Logicon became Northrop Grumman IT?

A. That's correct.

Q. Do you remember about when?

A. It went through a number of different



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

transitions. I believe it -- that occurred around -- sometime in 2000 or 2001.

Q. Before we got sidetracked with that, you were telling me about your new duties. I want to say you said, "director of leasing," but that's not fair. I know there is more. What exactly was it?

A. It was director of licensing and leasing.

Q. Okay. And what were your responsibilities in that position?

A. Primarily to maintain the same responsibilities I had originally as manager of subcontracts.

Q. Okay.

A. So I retained that. And we were working primarily with software companies at the time.

Q. Okay.

A. I would say our division was working about 90 percent with software companies and with software companies, of course, you don't buy the software, but you license the software. And so I was responsible for reviewing and drafting and negotiating all license agreements for the software. So that was one aspect of my job.

And the second aspect is in about 19- -- I believe the beginning of 1999, Northrop Grumman wanted



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

to originate a leasing program, a leasing/financing program.

Q. Okay.

A. There's a number of reasons for that, but I will set that aside for right now.

And I was asked to develop that leasing program.

Q. Tell you what. Why don't we go to those reasons. Can you give me a nutshell or a thumbnail sketch of why one would want to develop a leasing program.

A. Yeah. Primarily the entity for which I worked, which was called Application Solutions --

Q. Is that a portion of Northrop Grumman IT?

A. Yes. That is.

Q. Okay.

A. The entity for which I worked, Application Solutions, was primarily involved -- I would say 75 percent of its work was selling enterprise licenses, and that term needs to be defined.

Q. Yes.

A. But selling enterprise licenses to the United States Government.

Q. Okay.

A. And to do that, that entailed multi-year



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

funding. So it many times entailed funding for up to -- up to five or six years.

Q. Yes.

A. And to do that, the government many times did not have either the right color of money, the right type of funds, or did not have the ability for various reasons to acquire the software. And so we assisted them through this leasing program.

Q. Okay. Now, you mentioned enterprise licenses. Could you tell me what that is.

A. Generally what happens is that a government entity -- to the best of my knowledge.

Q. I understand.

A. A government entity will buy a myriad of different software products to facilitate their requirements and their directions. And with each software license that they buy, they also have to buy maintenance for that software on a yearly basis.

So what we have established under an enterprise license agreement was the aggregation of all of those licenses and the related maintenance associated therewith so that the government wouldn't have to worry about keeping track of all of those licenses, keeping track of all the maintenance and have to worry about funding that requirement each



*LegaLink, a Merrill Communications Company*
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

year.

Q. Okay. Now, I understand for my own reasons why I believe you would need to have maintenance agreements or continued maintenance for software, but rather than having me speculate as to why, could you give me a thumbnail sketch of why a person obtaining software would need to obtain maintenance for it and why it shouldn't just be something you plug into the computer and it's good.

A. Yeah. In my judgment, sir, maintenance is really -- that was the term that was used, but it's really a misnomer.

Q. Okay.

A. Really what maintenance entailed was updates of the software.

Q. Yes.

A. Upgrades of software. So if there were different versions of the software that were released during the interim of the time that the government owned the -- or had rights to the software, they would receive the upgrades as well.

Q. Yes.

A. And it also entailed phone support. So if the software -- if they had difficulties with the software, they could phone in and receive technical



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

support.

Q. Okay. A naive question, but why is it important to have these things?

A. The primary reason is so that the software is not obsolescent obsolete.

Q. I take it that without continual upgrades, et cetera, software has a very limited shelf life.

A. It depends upon the purpose for which it's intended by the government entity. But typically, that's the case.

Q. Fair enough. Now, at the time you were director of leasing and licensing --

A. Licenses and leasing.

Q. Sorry.

A. It doesn't matter.

Q. The director position. Who did you report to?

A. I originally reported to a gentleman named Vince Steckler.

Q. Okay. What was Mr. Steckler's position?

A. He was vice president of Application Solutions.

Q. Did that change at some point?

A. Yes. He left the company in about 2001. And then I reported to Mr. Guy Speers, who assumed his

position.

Q. I have seen Mr. Speers' name on a number of documents. Did Mr. Speers stay in that position until you left Northrop Grumman?

A. No.

Q. Okay.

A. Mr. Speers left -- and this is just an approximation, though.

Q. I understand.

A. Mr. Speers left Northrop Grumman in about the beginning of 2005.

Q. All right.

A. And at the time that he left, I then reported -- actually, I reported -- I reported to Mr. Jim Dean, who was the chief financial officer for Northrop Grumman Information Technology Computing Systems.

Q. Okay. Now, you said you worked in Application Solutions, which I guess is a branch of Northrop Grumman IT.

A. That's right.

Q. Was Application Solutions overseen -- I guess a better question is, how close to the top were you in Application Solutions? Was Mr. Speers or Mr. Steckler at the time at the top of Application



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

Solutions or was there somebody else above them?

A. They were the -- they were at the top level of Application Solutions.

Q. Okay.

A. To -- yeah, I'm sure that that's the case.

Q. Okay. Now, what was your position's relationship to Mr. John del Bando? D-E-L, B-A-N-D-O.

A. Mr. del Bando was the contracts administrator and so again, the relationship changed over time.

Q. All right.

A. But initially Mr. del Bando was in charge of administering the prime contract that we had that we haven't discussed as yet.

Q. That's correct.

A. That was the I-CASE, prime contract.

Q. Yes.

A. I was responsible for all subcontracts that fed into the servicing of that prime contract.

Q. Would you report to him? Would he be your equal? How would you characterize your relationship?

A. I would characterize it as associates.

Q. Okay. Who would he report to?

A. He reported to the director of contracts for Northrop Grumman Information Technology. I -- no,



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

I misspoke.
Q. That's okay.
A. You see, it's difficult to characterize this because there were a number of different transitions.
Q. Okay.
A. So he reported to different -- different levels at various times. But I believe he reported to the director of contracts for the group for which we -- for which we worked.
Q. Just to be clear, for Mr. del Bando, I think I want to talk -- as far as your relationship, I am sort of thinking in 2002 when the sort of claim was filed in this case.
Do you recall what the structure was then as far as who reported -- who did you report to and who did Mr. del Bando report to?
A. In 2002, I either reported to Mr. Guy Speers or Mr. Jim Dean. I don't remember which one at that point.
Q. I understand.
A. Mr. del Bando reported to the director of contracts for Northrop Grumman Information -- Application Solutions.
Q. Okay.

A. So there was no reporting relationship between Mr. del Bando and myself. So in other words, I didn't report to him nor did he report to me. We worked in association with one another.

Q. Okay. You described how you were the director of licensing and leasing or vice versa and I assume that position. Did your position with Northrop Grumman ever change -- or Northrop Grumman IT ever change?

A. After the -- after the director positions?

Q. Yes.

A. No.

Q. Are you currently employed by Northrop Grumman IT?

A. No.

Q. When did you leave their employment?

A. May 5 of 2006.

Q. Was that because they were downsizing?

A. It was actually retirement.

Q. Congratulations on your retirement.

A. Thank you.

Q. What is your current relationship with Northrop Grumman IT?

A. I have no relationship with them.

Q. Now, I mentioned the I-CASE contract.

Could you describe that in general terms.
A. The I-CASE contract was awarded, I believe to Logicon, in 1995. I believe. That was before I joined the company.
Q. And who was the contract with?
A. The contract was -- the government entity was Standard Systems Group, SSG. And I believe they are out of Alabama and they are an agency of the United States Air Force.
Q. Okay.
A. The I-CASE contract was an indefinite delivery/indefinite quantity contract. It had a dollar limitation of basically $750 million, I believe, thereabouts. And it -- many of the years that we worked on the I-CASE contract, I believe it was the largest resell- -- reselling contract that was employed by the United States Air Force.
Q. All right. Was I-CASE essentially a tool for the Air Force to obtain software from other parties through -- through Logicon?
A. Yes, it was.
Q. Is that a fair characterization of what the contract was for?
A. Amongst other things.
Q. What are the other things?

A. Primarily software, but also involved some hardware, information technology hardware, and also some services as well as maintenance.

Q. All right. When you say, "maintenance," do you mean maintenance the way you were describing to me earlier?

A. Maintenance of the software as I described as well as, if necessary or applicable, maintenance for the hardware.

Q. Yes. Which would be the more traditional --

A. Which would be the traditional maintenance.

Q. Okay. Now, I am going to turn to a matter that is the subject of this litigation, which is the StarBurst Omnicast software.

Are you familiar with that software?

A. Yes, I am. In general terms.

Q. Okay. In general terms, can you describe that software for me.

A. The StarBurst software was referred to as application software. And that's in contradistinction to database software.

Q. What is the distinction?

A. The database software is really, in my --



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

this is nontechnical.

Q. I understand. I am not going to hold you to it.

A. From a nontechnical perspective, database software is really the operational software of the computer. The database software is the software that's embedded within the computer causing the software to be able to generate all of the applications that the application software provides. So it's the nucleus, the -- the database software is the nucleus of the computer software.

Q. Yes.

A. The application software, which is -- which was being provided by StarBurst, is -- generically application software provides specific -- provides specific applications, specific purposes that are deemed necessary by the agency who procures it.

Q. Okay. Now --

A. I know that's not very definitive.

Q. That's a good generic look at it. And -- but let's turn to the StarBurst software. I understand that -- so the generic term, you consider it application software. When I say "the StarBurst software," I refer to the StarBurst Omnicast software, which is the subject of this litigation.

But do you know what the StarBurst software actually did?

A. No.

Q. Any idea about how it was used to send data or that it -- scratch that.

Do you have any notion that it was used as a means of distributing data to multiple users?

A. That, I am -- that -- if you establish parameters, particularly around that issue that you just raised, I am aware that it distributed data to multiple users.

Q. Okay.

A. But that's the limit of my knowledge of the software.

Q. I understand. You are not a software guy.

A. Not at all.

Q. I understand. And again, I am not asking you the intricacies of how it worked. But just sort of what its -- what its intended use was.

A. It was used by multiple users, I believe.

Q. Okay. That's all you really know.

A. That's the limit of what I know.

Q. Okay. That's fair enough. I am going to show you the first of a couple exhibits. I will have this marked by the court reporter.



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

MR. GELTNER: We will call this Bernstein No. 1?

MR. PROUTY: Yes.

(Deposition Exhibit 1 was marked for identification and is attached hereto.)

BY MR. PROUTY:

Q. I will ask you to take a quick look at that and you will see your name at the very top.

Does this reflect a printout of an email from your computer?

A. Does this reflect a printout from my computer?

Q. Yes.

A. No, sir.

Q. Usually the -- when the name is in the top like that -- you see "Bernstein, Barry"?

A. Yes.

Q. -- that means that the printout came from the computer of the person that --

A. Ah. I misunderstood. I thought you meant was this email generated by me. No. Yes, I believe this was a printout from my computer.

Q. Oh, very good. I am going to ask you to take a quick look at this just to familiarize yourself with it and then we will look at it in more detail



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

together. But I want you to be comfortable generally with what we are looking at.

A. Let me just spend a moment on this.

Q. Please do. Let me know when you are ready.

A. Okay.

Q. And I just want to use this opportunity to identify a lot of people mentioned here.

Guy Speers, I think you discussed earlier. He was your superior at Logicon/Northrop Grumman IT. Is that right?

A. Correct.

Q. Beneath that, there is a message from Jerry Soltis, S-O-L-T-I-S. I hope I am pronouncing that right.

What was his job?

A. Mr. Soltis was a sales representative who reported to Mr. Mittu.

Q. How do you spell "Mittu"?

A. M-I-T-T-U. Mr. Mittu then reported to Mr. Speers.

Q. And you say he was a sales representative. What did he sell?

A. He sold software to -- software products to the government.

MR. PROUTY: Can you pardon me for one moment? Let's go off the record for a moment.

(Telephonic interruption.)

BY MR. PROUTY:

Q. You were saying before the telephone interrupted us that -- I want to say you said he sold software to the government? Is that correct?

A. Yes. Correct.

Q. And who is Bonnie Frederick?

A. Bonnie Frederick was the secretary that worked for Northrop Grumman who worked on the East Coast.

Q. And when you say, "the secretary" --

A. She was actually the secretary for Mr. Speers.

Q. Oh, I see. Was Mr. Speers on the East Coast?

A. He originally was on the West Coast with me and then he moved to the East Coast.

Q. And the next message is from a Richard O'Brien. Do you see that?

A. Yes, I do.

Q. Who is he?

A. Mr. O'Brien, I believe, was a sales representative for StarBurst.

Q. What was the relationship between StarBurst and Northrop Grumman IT? Or Logicon, depending on when it was.
A. StarBurst was the subcontractor to Logicon.
Q. Now, in the -- sort of the middle blurb there for Mr. Soltis, it says, "FYI, Rick continually says 'contract' when he means 'special offer'."
Do you see that?
A. Yes, I do.
Q. Does "special offer" have a particular meaning within Logicon or Northrop Grumman?
A. Yes.
Q. What was that meaning?
A. "Special offer" was a term used as a proposal to the government.
Q. So a proposal to the government -- so when he says, "contract" in his statement below, Mr. O'Brien does, what they really mean is the proposal. Correct?
A. Correct. In the context of what I am reading.
Q. I understand. I understand. Now, the top part of this email is from Mr. Speers to you. And he asked you to check this clause out and he asked you


LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

whether it would create a problem, et cetera.

Do you recall whether or not you did check out the acceptance clause and warrant below?

A. Yes, I do recall.

Q. And what did you conclude?

A. I concluded that it would not cause us a problem.

Q. And do you recall why not?

A. Yes. As I recall, we were not going to accept the product from StarBurst until the government accepted the product from Logicon.

Q. Do you recall --

A. In addition -- excuse me -- and in addition, as I recall, the price that was being charged by StarBurst for this product included the first year of maintenance and therefore any warranty was subsumed within that first year of maintenance.

Q. Okay. I think we are done with Exhibit 1 for now. Put that aside.

I will mark Exhibit 2, which was also Exhibit 3 in Mr. Johnson's deposition, ironically enough.

(Deposition Exhibit 2 was marked for identification and is attached hereto.)

///

BY MR. PROUTY:

Q. It's not the best photocopy in the world, but I will ask you to take a look at that document for a moment. Familiarize yourself with it.

A. Yes, sir. Okay.

Q. Do you recognize that document?

A. Yes, I do.

Q. What is it?

A. It is a letter of essential need.

Q. And that's only the subject of it. What is meant by a "letter of essential need"? Is that a term of art?

A. I believe it is a term of art.

Q. Okay.

A. And what the letter of essential need is intended to specify is that the government who acquires the particular product to which the letter of essential need applies represents and warrants to Northrop Grumman that the products are essential to the operation of the entity for the period of which -- for the period of time for which the product is being financed or acquired.

Q. Why would Northrop Grumman want that?

A. For a couple of reasons. Reason number one is that -- if you remember, I was taught -- I



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

referred to "special offers."

Q. Yes.

A. When we provided the government a special offer, we provided the government most generally a significant reduction in the software price. In other words, if the government were going to acquire the software under a GSA schedule or another contract vehicle, they most typically would have to pay a significant amount more for that software than they would had they purchased it from Northrop under a special offer.

Q. Yes.

A. We could only provide them that special offer if in fact the software were being financed because the government was going to use that software for an extended period of time. And so therefore to comply with the bona fide needs statute, we wanted to assure that before we entered into the transaction with the government, the government specifically represented and warranted, which we relied upon, that they would need that equipment -- that they would need that software and they would continue to make the payments on that software because of the need that they had for the duration of the term of the lease.

Q. Was the purchase of the software financed



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

by Northrop Grumman itself or was it financed by a third party?

A. Financed by a third party.

Q. Was there a relationship to this letter of essential need to obtain the financing from the third party?

A. Can you restate the question?

Q. Sure. Is this letter of essential need something you would have provided to the third party who was doing the financing?

A. Yes.

Q. Would you have needed this letter of essential need to get financing from the third party?

A. Most generally -- let's put it this way. Let me restate that.

Under the -- under this -- under the transaction at issue, the letter of essential need was absolutely necessary. Now, there are some transactions subsequently -- I have done approximately 250 of these transactions -- there are some transactions where the letter of essential need is not required. But in this transaction, it was.

Q. Now, you say that with a great deal of certainty. Why is -- what do you recall about that?

A. My recollection was that the gentleman



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

with whom I was dealing primarily at the financing agency --

Q. Was that ePlus?

A. At the time it was MLC, I believe, and then they changed their name to ePlus.

Q. Everybody has changed their names, I guess, in this case.

A. That's right. But for purposes of our discussion, let's refer to it as ePlus, if we may.

Q. Yes.

A. The gentleman at ePlus was a gentleman named Bill Beale, B-E-A-L-E. Mr. Beale was the vice president of ePlus and he and I actually developed -- he assisted me in developing the leasing model for Northrop Grumman and he was the one with whom I would interface in financing each one of these transactions, and he stated that in this transaction with StarBurst and CECOM, a letter of essential need was absolutely necessary. And the reason particularly was because we were now dealing with application software, not database software, and application software has a tendency of being able to be changed out much more easily than database software.

Q. Was application -- was financing an application software through ePlus the norm or were



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

you more accustomed to dealing with database software with ePlus financing?

A. Up until the CECOM transaction, I believe -- you have to understand that the CECOM transaction was at the very initial stages of our leasing program.

Q. Yes.

A. So at the initial stages of our leasing program, we were financing entirely database software and I believe that the CECOM transaction was the first transaction we were involved in in dealing with the financing of application software.

Q. Very good. I was wondering why you were able to have such a good memory of this matter.

A. Well, I don't have a good memory, sir. I'm sure that I have forgotten a lot of things because there's a number of transactions that have taken place since that time.

Q. Yes.

A. But the reason why I particularly recall this transaction is because it was, if not the smallest dollar volume deal we have ever done, it was one of the smallest. And number two, it was the first deal that we did that involved application software. And number three, it was the first time that I worked



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

with CECOM.

Q. You said it was, if not the smallest, one of the smallest. Did you have a minimum amount that you would use under the I-CASE contract?

A. We established an unwritten policy that typically the minimum amount of -- that we would finance would be a transaction of a million dollars.

Q. Was this transaction less than a million dollars?

A. I believe it was 995,000. So just on the cusp of it.

Q. Now, on this letter, this Exhibit 2 in front of you, do you know who would have drafted it?

A. I don't know specifically, but I can speculate if you would like.

Q. Why don't you speculate and we will sort of deal with that a little bit, if we can.

A. I speculate that I drafted it.

Q. Okay. And what makes you believe that you drafted it?

A. The reason is because first of all, I was in charge of the leasing model for Northrop Grumman.

Q. Yes.

A. Number two, I was responsible for interfacing with the third-party financing source.

Q. Yes.

A. Number three, the third-party financing source was the one that required the essential need letter in conjunction with Northrop Grumman to facilitate the financing.

Q. Okay.

A. And I suspect I discussed it with Mr. Beale.

Q. All right. Would this letter have been drafted -- even if it wasn't you, would it have been drafted by somebody at Northrop Grumman?

A. Not necessarily.

Q. Is there any reason to believe it was actually drafted by Mr. Johnson who signed it?

A. Unequivocally not.

Q. And the reason is that this is being created purely for Northrop Grumman's purposes in obtaining the financing.

A. May I --

Q. Please do. Please correct me.

A. I don't mean to correct you, but may I just interject.

Q. Please.

A. I would say it was not drafted strictly for Northrop Grumman's purposes.

Q. Okay.
A. I believe that it was drafted for three parties' purposes. One being Northrop Grumman.
Q. Yes.
A. One being ePlus.
Q. Yes.
A. And one being CECOM -- one being the organization that Mr. Johnson represented.
Q. Okay. And in what way would this be -- serve the purposes of Mr. Johnson's organization?
A. I think it would serve his purpose in a number of ways. Number one, it allowed him to obtain the entire software package that was required without having to pay the entire amount of money initially.
Q. Yes.
A. So he had the use of the software at the inception of the program without having to make the total acquisition price.
Number two, based upon a conversation that I had with Mr. Johnson, I believe that Mr. Johnson at the time he executed this letter sincerely believed that he would need the software for a period of at least three years.
Q. Yes.
A. And number four -- or the next point is, I


LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

believe it provided Mr. Johnson the ability to acquire the software with operation -- initially with operation and maintenance funds, where this -- if he were going to acquire the software, he would have had to use capital funds, which he did not have at the time.

Q. Now, I believe in your second point -- I believe it was your second point -- you mentioned based upon a conversation you had with Mr. Johnson that you came to that conclusion about his desires.

A. Yes.

Q. Which conversation are you talking about?

A. That was a due diligence conversation that I had with Mr. Johnson and others. Just at the initial stages of entering into the contract.

Q. This would have been in the fall of 1999?

A. Approximately. I believe.

Q. Was the conversation in person or telephonic?

A. Telephonically.

Q. Did you ever meet Mr. Johnson in person?

A. No. No, I did not.

Q. Your call -- was it just one conversation or were there multiple?

A. The due diligence conversation was just

one conversation.

Q. Do you know if you took notes from that conversation?

A. I don't believe I did. I believe others did that were involved in the conversation, but I didn't.

Q. Was it a conference call?

A. Yes.

Q. Do you recall who else might have been involved in that conference call?

A. I believe Mr. Beale was involved.

Q. Yes.

A. And I believe there were representatives -- I believe there were representatives from ePlus's underwriting bank, Citizens Bank. And there may have been a representative also from Standard Systems Group of the Air Force.

Q. Based on this conversation, did you have an understanding of what the Army intended to use this software for or the -- whichever branch of the military that was going to use this software was going to use it for?

A. No, I did not.

Q. Would it refresh your recollection if I



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

were to suggest to you it was being used for research and development?

A. I'm sorry?

Q. Would it refresh your recollection if I suggested that it was being used for research and development?

A. I was -- I'm not aware of that.

Q. Okay.

(Discussion off the record.)

BY MR. PROUTY:

Q. We are back on the record and we were going over the essential need letter.

Let's go to what we will mark as Exhibit 3 to your deposition.

(Deposition Exhibit 3 was marked for identification and is attached hereto.)

BY MR. PROUTY:

Q. I want you to take a brief look at this. I don't need you to read it closely yet.

A. I see. This is on StarBurst. Oh, yes. Okay.

Q. Do you recognize that document?

A. Yes, I do.

Q. And I haven't asked you to read it closely yet, but I wondered if you have a generalized notion


LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

of what this document was for.
A. Yes, I do.
Q. What was that?
A. The primary purpose of this document was to obtain StarBurst's -- who was our subcontractor StarBurst's agreement and representation that in the event that for any reason the software was not used for the scheduled term of performance, that they would not replace the software for a period of one year from the date of termination.
Q. You say, "they."
A. "They," StarBurst.
Q. Okay. I am a little confused. Why would you -- in any event, if the -- why don't you repeat what you just said to me again. I'm sorry.
A. Okay. The primary purpose of this letter was to obtain StarBurst's representation and agreement that in the event that the total term of the program with the United States Government did not reach fruition for whatever purpose, they would not replace the software with that government agency for a period of one year from the date that the termination event took place.
Q. Okay. Why would you want that representation from StarBurst?

A. The primary reason we would want it from StarBurst is that we agreed to acquire three years of product from StarBurst.
Q. Yes.
A. All up front initially.
Q. Yes.
A. And we notified StarBurst, as we did with every other subcontractor of ours under a program of this nature, that we were financing the software with the third party. And so therefore we didn't want to provide StarBurst the benefits of having the acquisition funds for a three-year program up front and then go back and undercut either Northrop Grumman or our third-party financing company in the leasing transaction.
Q. Oh, I see. So generally to keep --
A. We didn't want them to undersell a new software product and then cause the termination of the lease.
Q. That makes a lot of sense. Thanks.
A. Now, if I may interject.
Q. Please do.
A. We also did the same thing in our leasing terms and conditions with the government.
Q. Yes. And was that leasing terms and



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

conditions in the I-CASE contract or was that a separate contract for obtaining this software?

A. It was in the leasing terms and conditions, which was a separate contract under a delivery order for obtaining the StarBurst software.

Q. Okay. And the purpose of that was the same, to prevent the government and StarBurst from going behind your back and getting a better bargain?

A. Well, it also -- it also extended on the part of the government, whereby -- under the term with the government -- it also extended with the government not only to StarBurst, but they under their terms and conditions represented to us that the software would be needed for the entire duration of the term of the agreement.

Q. Yes.

A. And in the event they were not appropriated funds or if they exercised a termination for convenience, we didn't want the government to go out and either buy the software from StarBurst or another company. So we could only have StarBurst represent on their -- on behalf of themselves. We expanded that on the part of the government as well.

Q. If you look at this letter, there's a number of understandings, and then sort of in the

bottom half of the first page, there's some numbered paragraphs.

You see those?

A. Yes, sir.

Q. Those strike me as things that were written to protect Northrop Grumman IT or Logicon, depending on when it was.

A. Yes.

Q. Do you know if this is language that you had given StarBurst?

A. Yes, it was. Let me say this: A portion of the language was language that we gave StarBurst.

Q. Do you know if there is a way to determine which language you gave to StarBurst and which language they created themselves?

A. I believe so.

Q. Okay. What would that be? Can you look --

A. I believe -- I believe the first paragraph under Paragraph 1 was language that Northrop Grumman provided.

Q. Okay. By "Paragraph 1," you are talking about Paragraph 1 on the bottom half of this page.

A. That's correct.

Q. What about Paragraph 2?



*LegaLink, a Merrill Communications Company*
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com