MR. GELTNER: Clarify that. There are two Paragraph 1's.
THE WITNESS: This is the nonindented Paragraph 1.
BY MR. PROUTY:
Q. Okay. What about the nonindented Paragraph 2?
A. Well, I would like to look at the second paragraph under Paragraph 1.
Q. Oh, please.
A. Northrop Grumman also provided the second paragraph under Paragraph 1.
Q. Okay.
A. Northrop Grumman provided the second paragraph.
Q. The one labeled Paragraph 2?
A. No. 2.
Q. "StarBurst agrees that" --
A. Yes, sir.
MR. GELTNER: Again, that is the nonindented Paragraph 2. Right?
THE WITNESS: Nonindented.
I don't know if Northrop Grumman provided Paragraph 3.
///



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

BY MR. PROUTY:

Q. All right.

A. The reason is because we typically don't provide that paragraph, so that may be -- that may have been unique for the StarBurst transaction.

Q. Okay.

A. I don't -- I don't know that specifically.

Q. I understand. Looking at the second page of the document, Paragraph 4.

A. I believe Northrop Grumman provided Paragraph 4. And Northrop Grumman provided Paragraph 5.

Q. Very good. I have a question about the nonindented Paragraph 2, on the bottom of the second -- of the first page, I should say.

A. Yes, sir.

Q. "StarBurst agrees that it will take no actions which will cause U.S. Government to exercise their rights to not renew or terminate the software license pursuant to Section 1(a) of the lease."

A. Yes.

Q. You said that was Northrop Grumman's language. Correct?

A. I believe so.

Q. What kinds of actions were contemplated under Paragraph 2?

A. The only action would be as we previously discussed, and that is StarBurst having a salesperson that was nonrelated to this transaction suggesting to the government that they acquire a different version or different release or different product of StarBurst, which would then impact or perturbate the current lease transaction.

Q. But wouldn't the limitations on government actions in the lease itself also prevent that?

A. It would. But I believe under current finance law, you cannot obtain -- at the time that this letter was written --

Q. Yes.

A. -- you could not obtain a software publisher's consent not to replace the software unless you first had the government's consent that they would not replace the software.

Q. Okay.

A. So if I obtained StarBurst's consent that they not replace the software without also obtaining the government's consent, StarBurst's consent would be invalid.

Q. Okay. We are done with this document for


LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

now.

I presume you are aware that the software was ultimately purchased by Northrop Grumman and provided to CECOM, C-E-C-O-M. Is that correct?

A. Yes. Yes, I am aware.

Q. And I have it somewhere, but I don't need to show it to you right now.

Do you recall actually signing the delivery -- or the purchase agreement with StarBurst yourself?

A. Yes, I do. Let's put it this way, I am extremely confident -- I don't -- I don't remember specifically signing it, but I am very confident that I did.

Q. For what it's worth, I have seen your signature on the documents and feel pretty good about that.

A. I believe I did.

Q. After the purchase and delivery of the software, were you involved at all yourself personally in anything that happened with the software in the next several months?

A. If you are referring to the acceptance process specifically --

Q. Yes.



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

A. -- I was not involved in that.
Q. And after the software was accepted, would Northrop Grumman have anything to do what was going on with the utilization or maintenance of the software?
A. No.
Q. If all had gone well, would the remainder of Northrop Grumman's responsibilities have been really to collect the lease payments when the lease payments were being made?
A. Primarily that would be the -- their responsibility, but it would also be to monitor the transaction to assure satisfaction on the part of the government and to maintain an interface with StarBurst.
Q. Do you know if you did those things in this case?
A. Well, you prefaced your question by asking if everything had gone well.
Q. Yes.
A. Unfortunately, it did not go well.
Q. Okay.
A. So actions were taken as a result of that that would not have been taken had it gone well.
Q. And I am going to get to the March 13, 2000 communications from StarBurst to you explaining

their acquisition by Adero in a moment.
A. Yes.
Q. But before that happened --
A. But that's not what I am referring to as not going well.
Q. Okay. What are you referring to, then?
A. From our perspective and to the best of my knowledge and recollection, of the 2- -- over 250 transactions that I have been involved in, this was the only lease finance transaction where the government refused to make the payments as initially promised. That's the -- what I am referring to as not going well.
Q. That happened subsequent to the March 2000 letter. Right?
A. No, I don't believe so.
Q. Well, the --
A. The reason why I say that, sir, if I may --
Q. Please.
A. -- is that -- and I stand to be corrected, but I believe that the next page under the lease was due the beginning -- in January of 2001 and that payment was not made.
Q. Sure.



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

A. And I do not believe we received any notification of any change in the StarBurst structure until significantly later in the year.

Q. Okay. Now, I think you are correct about it being January 2001 about the lease payment not being made because the purchase -- the original purchase was done in the fall of 1999. Correct?

A. As I recall, the original lease -- the lease transaction, I believe, was entered into in about the middle of 19- -- maybe the -- around September of -- September or October of 1999, I believe.

Q. Yes. Okay. In fact, the letter of essential need which we were just looking at a moment ago, Exhibit 2, if you want to refresh your recollection, is dated late September of 1999. Right?

A. Right. That would have been -- that would have been executed essentially concurrent with entering into the contract.

Q. Okay. And the next payment would have been made about a year later?

A. No.

Q. Okay.

A. I believe the next payment was scheduled to be made and was made in December of 1999.



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

Q. It would be the first payment.
A. There was a base payment and three option payments.
Q. Okay.
A. And I believe the first option payment was made in December of 1999.
Q. And the next --
A. Then the next one was scheduled for a year thereafter.
Q. Okay. Which would be the end of 2000, beginning of 2001.
A. I believe so. Yes.
Q. Now, with that in mind, I think if I were to give you a --
What I will do is mark it right now. Here is your 4. We will mark this document as Exhibit No. 4.
(Deposition Exhibit 4 was marked for identification and is attached hereto.)
BY MR. PROUTY:
Q. Mr. Bernstein, you see this is dated March 13 of 2000. Correct?
A. Yes, sir.
Q. So this would have been before the Army -- before CECOM failed to make its payment. Correct?

A. I'm sorry, I didn't hear you.
What did you say?
Q. This would have been before CECOM failed to make its payment. Correct?
A. Before CECOM failed to make the payment that was due, yes.
Q. Okay. All right. Now, I will ask you to -- before you start talking about Exhibit 4, you said that things didn't go right in this case because of the failure to make payments, et cetera.
That was in 2001, correct, or late 2000 that that happened?
A. I believe it was at the latter months of 2000.
Q. Okay. Prior to the failure to make the payment, were there any other problems with the contract?
A. Not to my knowledge. As a matter of fact, to the contrary. It was my understanding that it was reported that everything was going well.
Q. What involvement did Northrop Grumman have from the time of the signing of the contract and delivery of the software up until the point of this March 13, 2000 letter, if you recall?
A. Well, I recall specifically that they had



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

an involvement in assuring that the software was accepted by CECOM.

Q. Yes.

A. That it met -- fully met the requirements of the specifications. And this contract was in place with StarBurst for follow-on maintenance of the software.

Q. Second of those two, that it met the -- what was the second of those two?

A. Met the requirements of the specification.

Q. And how did you do that?

A. We did that through having CECOM execute a document of acceptance. I believe it's referred to as a DD250.

Q. Yes. Okay. And is that sort of what constituted your -- the means by which you determined that it met the needs?

A. Yes. Now, in conjunction with that, I know that there were conversations -- I believe there were conversations between Northrop Grumman technical representatives and CECOM in the process of having the DD250 executed.

Q. Were you a part of those conversations?

A. No, sir.

Q. Do you know who would have been a party to



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

those conversations?
A. I believe that one or -- one or all of three people may have been.
Q. Okay.
A. Mr. Guy Speers. There was a Ms. Joanna Stegall, S-T-E-G-A-L-L.
Q. Who is Ms. Stegall?
A. She was the -- I don't know what her exact title was, but she was -- she was the person that, amongst other things, was responsible for generating the acceptance document and having it executed.
Q. Yes.
A. And there was a Mr. Bill Malthouse, who was involved in our technical group that was responsible for interfacing with the customer to assure that the software was satisfactory.
Q. Do you know whether or not the representation that the software was satisfactory was based upon any testing of the software in the field?
A. I don't know.
Q. Now, let's turn to Exhibit 4, then, the March 13, 2000 letter for Mr. Andrews to you.
A. Yes, sir.
Q. Does this letter look familiar to you?
A. Yes.



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

Q. Do you want to familiarize yourself with it or are you already familiar with it?

A. I would like to look at it for just a moment.

Q. Please do.

A. Okay.

Q. I take it -- do you recall if you received this letter about the time and the date above it?

A. Approximately.

Q. And did you consider the acquisition of StarBurst by Adero to be good news or bad news or indifferent to you?

A. Indifferent.

Q. On the third full paragraph of this letter, it discusses that:

"StarBurst will continue 5 x 8 phone support for the next 12 months and continue to distribute and support any software patches or fixes as per our existing maintenance agreement," and that it would "discuss a program with each customer to allow them to buy receiving clients over the next 12 months or as otherwise provided."

What did that mean to you?

A. It meant to me that there would be a continuance of the maintenance obligations that StarBurst had assumed under the original contract.

Q. Under the next paragraph --

A. Under the next --

Q. Yeah.

A. -- paragraph?

Q. Yeah.

"StarBurst will discontinue the selling of StarBurst software products to new customers and will not be releasing any new versions past its current Omnicast 1.75."

A. Yes.

Q. What are the implications of that?

A. The implications were, number -- well, twofold. Number one, that we would not be acquiring additional software from StarBurst, obviously by definition because it was not available. And number two, we would not have to worry about any updates or new versions of the software, so that -- and that might as well be beneficial for the government because they wouldn't have to worry about any new releases of the software beyond Version 1.75. So that Version 1.75 would be the most current software during

the term of the financing transaction.

Q. Earlier in the deposition you suggested that "under maintenance" would include new versions of the software, et cetera. Do you recall that?

A. Yes, I do.

Q. And I believe you said something to the effect of -- please correct me if I am mischaracterizing it -- if one didn't continually update the software, it risked becoming obsolescent. Do you recall that?

A. I do.

Q. Would that not also apply in this case, that if the versions stopping at 1.75 would -- that is, if there are no versions to follow 1.75, wouldn't there be a risk of the software becoming obsolescent?

A. No, sir.

Q. Why not?

A. Because this happens with many, many software publishers. The reason for software maintenance is to assure that the government customer obtains the latest update if that update is ever released. However, with many software publishers -- software publishers like Microsoft, Sybase, Oracle, et cetera, et cetera -- for a year or two years, there may not be a software update or release. So therefore

there is no need for the government to obtain that additional release if it's never -- if it's never offered.

Q. Okay.

A. So it's really an insurance program. The soft- -- the maintenance program is really an insurance program and that insurance program provides the government the ability to obtain the latest software that's released onto the market.

Q. Okay.

A. If it's not released onto the market, there is no -- then they shouldn't have to worry about it.

Q. What, if anything, did you do after you received this letter?

A. I provided it to Mr. Speers. I provided it to Northrop Grumman staff, technical staff. And I believe my -- that was the -- I believe that was the limit of my actions. I know there were some other actions taken by Northrop Grumman.

Q. When you provided this letter to Mr. Speers or members of the Northrop Grumman staff, was there any response that you recall?

A. No.

Q. Now, you said that Northrop Grumman took

other actions. I believe you just said that.
A. Yes.
Q. What other actions were those?
A. I believe, based upon my recollection of events beyond 2000, even into 2001, that Northrop Grumman contacted StarBurst to obtain other sources that would be available to continue on with the maintenance of the software.
Q. And do you know why Northrop Grumman did that?
A. I don't know. I don't know.
Q. We will do one more exhibit before we take our break.
Mark this as 5.
(Deposition Exhibit 5 was marked for identification and is attached hereto.)
BY MR. PROUTY:
Q. And you are not a recipient on this email. But I wonder if you might know who some of these individuals are.
Do you know who Mr. Randy Korich, K-O-R-I-C-H, is?
A. No, sir, I don't. I have never -- I don't believe I have ever seen that name.
Q. Okay. In that case, it's really very

easy. We are done with that exhibit.

A. Would you prefer if I didn't read this?

Q. I don't care. But we are done with that exhibit.

A. Okay.

Q. Because the exhibit was so short, we will go to one more before the break.

We will mark this as Exhibit 6.

(Deposition Exhibit 6 was marked for identification and is attached hereto.)

BY MR. PROUTY:

Q. I ask you to take a quick look at this.

A. Ah, geez. Okay.

Q. When you first looked at Exhibit 6, you said, "Ah, geez."

Could you tell me why?

A. That was a comment on Mr. Soltis.

Q. Okay. Okay. What was the comment about on Mr. Soltis?

A. My view of Jerry Soltis is that he was somewhat extravagant.

Q. Okay. Now, do you know who Margaret or Peg Higgins is?

A. No. No, sir. I don't.

Q. Now, Mr. Soltis -- well, let's look at the

part Ms. Higgins wrote.

A. Okay.

Q. Okay. Even if you don't know who she is, I want to sort of see --

A. Um-hum.

Q. I am seeking to see if you are familiar with the problems she is addressing, even though it's not written by you.

She speaks in the first part after introducing herself, talking about the Logicon large investment in StarBurst.

A. Let me see that. "Logicon has a large investment in StarBurst."

Q. You see that?

A. Yes, I see that.

Q. Does that mean an investment beyond just the CECOM deal?

A. To the best of my knowledge, the only involvement Northrop Grumman, period, ever had with StarBurst is the CECOM transaction.

Q. Now, I know --

A. This is a little complicated.

Q. Please explain.

A. Jerry Soltis was the kind of guy that would throw out a lot of feelers and in the majority



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

of instances, nothing ever happened with them. And I know that when the payment did not come through by CECOM and they were complaining about the software, that Mr. Speers had Mr. Soltis get involved in this.

And I specifically recall talking with Guy, who was not only my boss, but also a very good friend of mine, and I said, "Guy, we need to kind of put Jerry aside, not get him involved as much, put some more technical people on this and I need you, Guy, to get involved in it specifically."

So that's why I am saying, "Oh, gee," and I am concerned -- I am a little surprised to see Jerry's dabbling with these people. I don't -- let me just say that I question the credence of all of this a little bit. And that may be my idiosyncrasy myself.

Q. If it makes you -- relieves you any at all, this correspondence happened in 2000 -- March of 2000 before there were any concerns about CECOM not paying on the lease.

A. I don't know what this is all about, but --

Q. Okay. So as far as you know, the only investment that Logicon/Northrop Grumman had in StarBurst was with the CECOM contract.

A. Yes. But I would be willing to bet that



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

Jerry Soltis said, "Hey, we have a deal with DARPA, we have a deal with DISA and this is pending. This Navy deal is pending. This Marine deal is pending. We will need StarBurst for this." But those were all, in my judgment, blue sky.

Q. Okay. I understand.

A. They weren't real quantifiable.

Q. If there had been a deal with DARPA and DISA, you would have known about it.

A. If it were a deal under the I-CASE contract or anything that related to Application Solutions, definitely I would.

Q. And Mr. Soltis would only have knowledge of things on the I-CASE contract or Application Solutions. Correct?

A. Yes.

Q. Now, in Ms. Higgins' letter, she mentioned the possibility of obtaining source code, I believe.

A. That's ludicrous, if I may say.

Q. Okay. And in fact, Mr. Soltis, I think, echoes it as well.

A. That it's ludicrous?

Q. No, no. That there is some talk about the source code.

A. That's not -- that just doesn't happen.

Q. Okay. I think I suspect why that might be the case, but could you explicate why it seems so ludicrous to you?

A. The source code is the lifeblood of the software publisher. The source code is the nucleus of the software and, to my knowledge and my experience, a software publisher has never released the source code. It's proprietary.

Q. Right. Do you know any circumstances where a software developer would release the source code?

A. Yes.

Q. What would that be?

A. Where they would put it in trust in the event they went bankrupt.

Q. I take it you never saw this email exchange until today?

A. Let me say this: I am 99.9 percent positive I have not. I mean, there is -- like I say, there is a lot of time that's gone by.

Q. Of course.

A. I don't want to say something that I'm not positive of, but I don't believe I have.

Q. That's fair enough. From the time you received the March 15, 2000 letter from StarBurst,

telling you that, "We are stopping -- we have been obtained by Adero and we are going to stop at Version 1.75," et cetera, until the time that CECOM failed to make its payment on the next lease payment, do you recall anything else happening involving you in this contract?

A. May I ask for clarification?

Q. Please.

A. Are you asking was I involved any time between the date that I received this letter from StarBurst and the time of the failure to make the next payment?

Q. Sure. Did anything happen?

A. Not to my knowledge.

Q. Okay.

Great. Perfect time for us to take our break.

(Recess taken.)

BY MR. PROUTY:

Q. We are back on the record. We have had our break and I am going to give you a document --

We will mark it as Exhibit 7.

(Deposition Exhibit 7 was marked for identification and is attached hereto.)

///

BY MR. PROUTY:

Q. I will ask you to take a quick look at that.

A. Uh-huh. Okay. Let me just -- ah-ha. That's the gentleman.

Uh-huh. Okay.

Q. I see that you are cc'd on this email. Do you recall receiving it?

A. No, I don't recall, actually.

Q. Even if you don't recall receiving this particular email, do you recall the idea that Logicon asked CECOM not to return its software until after a particular meeting?

A. I -- now that I -- now that you mention it, I do recall a conversation with Mr. Speers about that.

Q. And could you elaborate upon that conversation.

A. Yes. As I recall, I had -- I had a conversation with Mr. Johnson on approximately two or three occasions before -- I believe before the issuance of this email.

Q. All right.

A. And I believe during those conversations, as I recall, Mr. Johnson and I had essentially reached



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

an agreement in principle as to how we were going to proceed in allowing CECOM to make that next payment.

Q. Okay.

A. So therefore it seems logical to me, now that I see this email, that Mr. Speers would ask the government contracting officer not to have the software returned as required. And that was an issue, incidentally.

Q. Yes.

A. But not to have the software returned at this point in time pending the outcome of this agreement in principle.

Q. I think it's possible the agreement in principle you arrived at with Mr. Johnson occurred in the spring of 2001 instead of in December of 2000.

A. That's -- well, let's see. I need to get my dates set correctly because --

Q. What I am --

A. It's strange to me that this letter would be -- this email would be issued in December of 2000 when the payment was not -- as I remember, the payment wasn't due until December of 2000. So why would he issue this -- this email at that point? The date of December 2000 seems to be problematic to me --

Q. Okay.

A. -- because of -- because of the due date of the next payment.

Q. Is it possible that CECOM had informed you prior to the date of this email that they were not going to make that payment?

A. To the best of my knowledge, it -- that did not occur.

Q. Okay.

A. To the best of my knowledge, CECOM didn't notify anyone that they weren't going to make the payment.

Q. Is there any logical reason why this email would have been sent on December 20, 2000 prior to -- without Northrop Grumman being aware that CECOM was not going to make its lease payment?

A. If I understand the question correctly, the only -- the only need to return the software would be if the payment were not being made.

Q. Yes.

A. And under the terms, I believe, of the agreement -- and the reason why I recall this is because this is standard within these agreements -- is that the agency is obligated to return the software within 30 days from the nonpayment.

Q. Yes.

A. So therefore, if this next payment was not due until December 2000, this email seems to be -- to be premature. If my timeline is correct.

Q. Sure. Now --

A. Is there something I am missing here?

Q. I don't think so. I am not trying to trick you.

A. No. I -- no. I don't assume that.

Q. It strikes me that it's possible that by the time of this letter in December 22, 2000, there must have been some knowledge on the part of Logicon/Northrop Grumman that CECOM was going to not make a payment on the lease and was going to return the software.

Wouldn't that seem reasonable?

A. Well, may I ask a question?

Q. Please.

A. Is there any other documentation or any other verbal discussions that are available to us that indicate that? I mean, that's only speculation.

Q. Sure. I --

A. Because, I mean, my discussions with -- I mean, as I recall my discussions with Guy Speers, he wasn't even aware they were going to make the payment. So. I mean, this letter comes -- this email kind of

comes as a surprise.

Q. Okay. Well, in the email -- we will worry about the dates later on, I suppose. It does talk about a meeting with CECOM on January 5 with Eric Stern and Joe Johnson and Guy Speers, apparently.

Do you recall being informed about this meeting?

A. The only thing I recall -- I don't believe the meeting ever occurred.

Q. Why do --

A. I don't even know why there was a meeting on January 5 of 2000 -- 2001.

Q. Yes.

A. I don't know.

Can you refresh my memory on something?

Q. Sure.

A. When was the next payment due?

Q. My belief is it was due in December --

A. Of 2000.

Q. Yes.

A. So if the payment was due in December of 2000, why would there be a meeting on January 5 of 2001 and why on December 22 of 2000 would Guy Speers say, "Don't return the software"? There is no need to return the software because the payment isn't even due



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

yet.

Q. Unless, of course, it was due some other date in 2000 -- in December of 2000, the 22nd.

A. Well, if it's -- I mean, based upon 10 years of doing this stuff, if a payment is due on December 1st and it's not made until December 22nd, it's a nonissue.

Q. Okay.

A. It becomes an issue if it's not made, let's say, a month or, let's say, two months or three months thereafter.

Q. Sure.

A. Then we follow -- then we become concerned. But if we are talking about a couple of weeks, it's inconsequential.

Q. I guess this suggested to me, and I am asking if it suggests to you as well -- I actually don't want to testify -- that somehow or other, there had been communications before this email from CECOM to Logicon. Maybe not to you, but to Mr. Speers, saying, "We are not going to pay."

A. Ah.

Q. I see a light going off in your head.

A. I would highly doubt that that's the case.

Q. Okay.



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

A. But I just noticed something. I notice that this email is to Dorothy Priest.

Q. Yes.

A. Dorothy Priest is a junior -- a junior -- was a very junior-junior entry-level contracts administration -- contracts administrator for Systems -- Standard Systems Group.

Q. Yes.

A. So it would seem to me that if Guy had some concern about the software one way or another, he would have communicated directly with CECOM, not with a junior-junior contracts administrator at Standard Systems Group. So I think this is -- there's other things involved in this other than just the issue of the delayed payment.

Q. You see it's cc'd also to Joe Johnson at Monmouth -- the Army and Joe Johnson was essentially the individual --

A. I see that. Why wasn't it -- well, we are just speculating.

Q. Okay. Let me ask you this: In December of 2000, was there any value of the actual boxed-up software to Northrop Grumman?

A. I'm sorry? I didn't hear. Was there a value?

Q. Yeah. Was the actual -- the actual cartons with the disks, et cetera, in them of the StarBurst software, had those been packed up and mailed to Northrop Grumman?
A. No.
Q. I'm sorry. That there's no value? I want to make sure you are answering my question, I guess.
A. I don't think I understand your question.
Q. No problem. Let's say the Army had taken its StarBurst software and put it back in the boxes it received them in, and when I say the "software," I mean the disc, diskettes, whatever it is --
A. I understand.
Q. -- and ship them back to you. Okay?
Would there have been any value to Northrop Grumman?
A. Absolutely.
Q. What value would that be?
A. Extremely.
Q. What's that?
A. The value would be manyfold. Number one, we could potentially remarket the value -- we could potentially remarket the software, I'm sorry, to someone else.
Number two, it would evidence -- the value

would be that it would evidence that CECOM disengaged the software from the computer as was required under the contract.

And number three, we would be able to meet our commitments with the -- with ePlus, the third-party leasing agency. Financing agency.

Q. What commitment was that?

A. That commitment was that in the event that the end user did not make the payments within 30 days, they would return the software and they would not have use of the software. So the value to Northrop Grumman in this case would be the value that CECOM did not have the value of the software because they weren't making the payment for it.

Q. Sure. As far as remarketing goes, would you have actually remarketed the StarBurst software?

A. The answer is the probability -- it's just an answer of probabilities. The answer of probabilities is the probabilities are yes, because that was one of the obligations that we had in our agreement with the financing agency, that in the event payments were not made and there were a breach of contract, we would assist the finance agency in remarketing the software.

Q. I understand you would assist them in



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

doing so, but was the StarBurst offer remarketable at that point given the fact --

A. That's not for me to say. I mean, I don't -- I don't -- anybody here, I believe, would be merely speculating. But if I go back to what I believe is an extravagant letter of Jerry Soltis, he believes it's marketable because he's saying there is a potential opportunity with DARPA and DISA. So by his own -- by the salesman's own contention, it's marketable.

Q. Okay. Do you have any reason to believe the Army was still using the StarBurst software after the -- it failed to make its payment on the lease?

A. I strongly believe they were -- they continued to use it.

Q. What's that based upon?

A. A conversation that I had with Mr. -- with Mr. Johnson.

Q. When was this conversation?

A. That, I don't recall. I had more than one conversation. As I said, I think I had one or two or three conversations with Mr. Johnson, but I believe it was the first conversation I had with him and I would speculate -- and it's purely speculation, but I would speculate it was probably around March of 2000.

Q. 2000 or 2001?
A. Excuse me. Excuse me. March of 2001.
Q. What did he say in that conversation that led you to believe they were still using the software?
A. As I recall, Mr. Johnson said that the software had not been disengaged from the computers. That they, CECOM, were developing another version of the software in CECOM's development laboratory. And as a result of their development efforts within the CECOM development laboratory, the current software that they were using of StarBurst was less valuable to them than it had been at the time they acquired it.
Q. You say the -- when you say the software -- they are developing a new version of the software, do you mean a new version of the StarBurst software or do you mean a new version of the Army battle command -- battle management software that StarBurst was a part of?
A. It was my -- it was my understanding that Mr. Johnson said they were developing a new version of the StarBurst software that they currently had in their possession. Now, I don't remember what the version was that we sold CECOM. But let me say that I think it was Version 3 or 4. And assuming that it was Version 4, I -- not clearly, but I somewhat recall

Mr. Johnson saying that they were developing Version 6. That they were skipping Version 5 and they were on to developing Version 6 themselves.

Q. First of all, the letter in March of 2000 from StarBurst to you says they were going to stop at Version 1.75.

How could they be stopping at Version 1.75 if you had already sold Version 3 or 4 to the Army?

A. Well, I think what we have to do, and here again, it's because of my lack of technical knowledge -- but -- I'm not sure, but I highly believe that when StarBurst is saying that they are stopping -- let me get the exact words -- when StarBurst is saying that they are stopping Omnicast 1.75, that's a version of the Omnicast software.

Q. Yes.

A. There may have been many releases prior to Version 1.75, so a release, I believe, is different than a version. So I believe that we sold them Release No. 3 or 4 and I believe that Mr. Johnson was saying that they were working on Release 6 and I don't believe the releases have anything that is synonymous with the version.

Q. You say they were working on Release 6.



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

Do you mean they were working on a release they received themselves from StarBurst?

A. No. I believe they were working on something that they had independently developed.

Q. Do you know if it's possible to develop a new version of, for example, StarBurst software without having their source code?

A. Logic tells me that it's not, but there may have been -- but, you know, again, if I go any further on this, I'm only going way beyond my knowledge of expertise.

Q. I am just going to suggest to you that perhaps by Version 6, in your conversation with Mr. Johnson, he was talking about the Army battle management software as opposed to the StarBurst Omnicast software. Is that possible?

A. It's possible.

Q. Would that be consistent with your recollection of the conversation?

A. It's possible. But if I may add --

Q. Please.

A. -- I believe it's consistent with my conversation with Mr. Johnson. But I believe it's inconsistent with the due diligence conversation that I had with Mr. Johnson previously.



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

Q. Okay. Why is that?
A. Because Mr. Johnson at the time of our due diligence conversation stated that they would be using the StarBurst software, that they would not be developing any new releases or versions themselves and that they would use their best efforts to obtain funds to continue on making the payments.
Q. And the due diligence conversation occurred in September or so of 1999. Correct?
A. That's correct.
Q. The later conversation, where you said you believed that he was not -- he had not removed the StarBurst software from his computers, took place in early 2001. Right?
A. That's correct.
Q. So at least a year or later.
A. That's right.
MR. PROUTY: Now we will mark this document as Exhibit 8.
(Deposition Exhibit 8 was marked for identification and is attached hereto.)
BY MR. PROUTY:
Q. Mr. Bernstein, this is the document that I was -- mentioned just a little while ago, where I thought your discussions with Mr. Johnson you are



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

remembering occurred in 2001 instead of before the 2000 letter.

A. Yes.

Q. I will let you take a chance to sort of review this document.

A. Yeah. I would like to read this.

Okay.

Q. Okay? Does this letter refresh your memory about when the discussions might have been?

A. Yes, sir, it does.

Q. What do you conclude?

A. I conclude from this that, as I said previously, I had reached an agreement in principle with Mr. Johnson.

Q. A couple things. First of all, I presume this actually was an email written by you. Correct?

A. Yes, it was.

Q. The discussions with Mr. Johnson would have occurred in April of 2001?

A. From the -- from the date of this email, evidently that was correct.

Q. Do you have any reason to believe that's not correct?

A. No.

Q. Do you recall the conversations you had



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

with Mr. Johnson, whether or not there would have been other conversations before the two discussed in this email?

A. It's possible. It's possible because I know that I drafted a settlement agreement that I sent to Mr. Johnson, but I -- I don't recall when. I don't know if that was before this or after this.

Q. Okay. Was it about that time?

A. I would say within a month or two.

Q. Would it make sense that the settlement agreement would have incorporated the agreement you sort of outlined here in this --

A. No. I think it was different.

Q. Oh, you do?

A. Yeah.

Q. Do you have any recollection of how it was different?

A. Yeah. I believe that the settlement agreement that I sent to Mr. Johnson specified that both payments would be made. I don't believe there was any mention of forgiving the second payment. And I believe that it elaborated on the tasks that we would be providing to Mr. Johnson to assist him and us providing additional work gratuitously for CECOM.

Q. Okay. With that recollection in mind of



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

what was in that settlement agreement versus what is in this email, does that help you recall whether or not the agreement went out before this email or after?

A. I don't -- I don't -- I don't know. I am confused by it, actually.

Q. Okay. That's fair enough. Let's sort of -- let's see if we can figure it out between the two of us. If you had sent that settlement agreement to him prior to this email or actually -- it would suggest to me it would have occurred prior to the two discussions in this email.

Does that make sense?

A. As -- you know, as I am sitting here, intuitively I believe that I sent the settlement agreement prior to this agreement. And I believe that for some -- I don't -- for some unexplicable reason, the settlement agreement was not executed and then we had continued conversations which may have led to this agreement.

Q. Right.

A. That's kind of what's going through my mind.

Q. I understand that, of course, it's a long time ago and we recognize that you have got caveats involved because your memory isn't perfect on this. I



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

am trying figure out the most likely course of events here.

A. If we looked at -- I don't know if you have a copy of the settlement agreement.

Q. I --

A. That would kind of answer the question itself.

Q. I do not. I do not.

A. Okay.

Q. Do you recall at all any conversations leading to that settlement agreement?

A. Yes. That was the first conversation I had with Mr. Johnson.

Q. And by "first conversation with Mr. Johnson," of course, you are not talking about the due diligence conversation, but the first conversation --

A. The first conversation I had on this subject.

Q. All right. Do you recall whether or not he agreed with you on the phone that he would sign that settlement agreement or that he -- what the nature of that was?

A. You know, the -- I can't -- I'm not going to say that he explicitly stated he could execute the



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

agreement, but I was led to believe that based upon -- as I recall, based upon the fact that much of that settlement agreement contained words that I was not smart enough to incorporate, there were words that came from Mr. Johnson that he would require to come to an agreement.

Q. Okay.

A. So I incorporated a lot of the verbiage that was asked by Mr. Johnson and as I recall, by me incorporating that language, there was an agreement that the matter would be settled.

Q. Okay.

A. But, you know -- but again, I don't know if this is just academic, because it's just a settlement conference.

Q. Sure. Sure. In a way, it might be somewhat academic. But there are a few questions I actually have about this document, but I wanted to sort of nail down this context first.

A. May I interject one other point?

Q. Please do.

A. At the time -- as I stated, I think, at the beginning of our conversation, to my recollection, this is the only time out of about 250 transactions where a lease had not been paid as committed.

Q. Yes.

A. And I know that Northrop Grumman, and particularly Northrop Grumman Application Solutions, and I strongly believe also ePlus in a case of this situation would much prefer to settle this through negotiation rather than settling through litigation.

Q. Naturally.

A. So that was really the intent here, was to -- rather than looking at, "Well, we are going to have CECOM disengage the software," rather than starting from a contentious point of view, I believe we were really attempting to start from a cooperative perspective with Mr. Johnson.

Q. Sure. I don't think anybody is suggesting that because a -- a sophisticated commercial entity would prefer to negotiate than litigate that it's an indication of a fault on anybody's part.

A. No. I am just saying, that's -- we felt that we had a negotiated agreement.

Q. Sure. Do you recall at all Mr. Johnson ever rejecting your agreement?

A. Yes. But it wasn't Mr. Johnson who rejected it, as I recall.

Q. Who was it?

A. And I didn't know the general -- I was

thinking about it last night. And I didn't recall the gentleman's name. But now that -- I saw his name in an email. I think it was Mr. Stern, Eric Stern.

Q. Okay.

A. And I thought to myself, that's kind of -- it's kind of curious because Eric Stern was a contracts type and -- but he was not ever involved in the negotiation of the original transaction. I think he came in and had an influence on Mr. Johnson after the fact rather than before the fact.

In addition to that, I started thinking last night that I recall the conversation that I had with a litigation attorney of CECOM, who called -- and I don't recall his name. I believe his first name was Gary. A really nice guy. But he called me four or five times relative to -- relative to a settlement agreement.

Q. Yes.

A. And I was led to believe, based upon my conversations with him as well, that a settlement agreement was in place.

Q. Okay.

A. But I believe it was because of Mr. -- but when I spoke with Mr. Johnson subsequently, he told me that because of his conversations with Mr. Stern, they



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

decided not to accept the agreement.

Q. Okay.

A. And he kind of cut the conversation short. It was just left at that.

Q. Was there any discussion during this conversation or any conversation with Mr. Johnson in which you asked him to send the software back to you?

A. Yes.

Q. And do you recall when?

A. It was the first conversation we had. I didn't ask -- let me -- let me -- let me correct my statement.

Q. Please.

A. As I recall, I didn't ask him to return the software.

Q. Okay.

A. But I do recall specifically reminding him of the conditions that he failed to return the software as required under the 30-day requirement.

Q. Okay. And do you recall if Mr. Johnson responded?

A. I don't. I don't. He may -- I don't recall.

Q. Now, let's do Exhibit 8. And about four lines down, there is a sentence that begins, "the last

payment of $285,000."

Do you see that?

A. Yes, I do.

Q. -- "will be contingent upon us helping
CECOM find a substitution product(s)
(CacheStream, etc.) by a date certain."

Do you know why CECOM needed a substitution product?

A. I don't know why, but I can -- but I can spec- -- I mean, I believe I know why. But I don't definitely know why, but, like I say, I believe I know why.

Q. And why do you believe?

A. Because of the letter that I received, and I speculate that Mr. Johnson received, from StarBurst saying they were going out of business.

Q. Yes.

A. And so I speculate that that letter was used by CECOM to justify the actions that they took. Whether or not it was right or wrong, I believe they used that as a -- for a reason that would -- that the letter was not intended to be used. And I believe that Mr. Johnson used that letter to justify the fact that he did not have to make that next payment because there was no available source for the software, when

in fact in practice, I know that I was involved in talking with two or three other companies during this period of time which represented to me that they could provide the software and any updates to that software that was required by StarBurst.

Q. By StarBurst or do you mean by CECOM?

A. By Star- -- which was required by CECOM to be provided by StarBurst, who went out of business. So what I am saying is that and I'm sorry for the long-winded response --

Q. That's fine.

A. -- but I believe that Mr. Johnson was saying, "Hey, I don't have to make this payment because StarBurst has gone out of business and I can't get software from StarBurst." I believe that was his rationalization.

Conversely, I spoke to other companies during this period of time that said, "No problem, Barry. We can provide the software in the event that CECOM needs it that would ordinarily have been provided by StarBurst had they not gone out of business."

Q. But that software those other companies would provide would not actually be the Omnicast StarBurst software. It would be those companies' own

software that did the same thing. Isn't that right?
A. I think -- I would agree with you. It would be their -- it wouldn't be the StarBurst software.
Q. Right.
A. It would be the -- but it would be -- it would be software that would perform the same functionability.
Q. Precisely. Which is the substitution product. Right?
A. That's right.
Q. So --
A. So when I agreed to that, I agreed to it with the understanding in mind that -- no problem agreeing to that because I know that there are companies that can do that.
Q. I think we are on same page on that score as far as there being other companies who could provide a substitution product, but the question that's sort of led to this digression was, why did they need to substitute a product for the actual Omnicast StarBurst software?
A. Can I be very candid?
Q. Please.
A. In my humble judgment, sir, they didn't



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

need a substitution product.

Q. Okay.

A. But in my judgment, what they did need is an assurance that there would be a product available in the event they wanted to use that as a rationalization for not making the payment.

Q. Okay. Why, in your opinion, did they not need a substitution product?

A. Because the product that they currently had was warranted and represented to us to be sufficient for the period of three years.

Q. So you are saying that you made the agreement to find them a substitute essentially because that was --

A. To pre-empt a rationalization that was an irrational rationalization, in my judgment.

Q. Very good.

All right. We are done with this document and we are going to go to 9.

(Deposition Exhibit 9 was marked for identification and is attached hereto.)

(Discussion off the record.)

BY MR. PROUTY:

Q. While we were off the record, Mr. Bernstein, you gave me a little information about



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

other things that were going on with Northrop Grumman trying to help CECOM out, I believe. I think you wanted to be off the record because you were afraid it was not responsive to any question.

By all means, I would like to know these sorts of things, so if you could repeat to me what it is you told us off the record, I would be appreciative.

A. Oh, okay. What I mentioned is that in conjunction with us obtaining other sources to support the StarBurst software, Northrop Grumman through our senior technical representative, Mr. Bill Malthouse, was performing a number of services gratuitously for CECOM to support them in assuring that they could continue using the software provided by StarBurst.

Q. How were you aware of those services being provided?

A. Through emails by Mr. Malthouse, by conversations that I had with Mr. Malthouse and by conversations that I had with Guy Speers.

Q. Do you know what kind of services he was providing?

A. I know that he had meetings with Mr. Johnson and I know that he had meetings in addition -- and I can't remember the name -- but of



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

Mr. Johnson's -- Mr. Johnson had a government consultant that I used to work with many, many years early on in my -- I know that Mr. Malthouse met with CECOM's technical consultants as well on a number of occasions. Micom -- is it Micom? Mitre. Mitre, excuse me. M-I-T-R-E.

Q. Yes.

A. Mitre, I believe, was CECOM's consultant that they met with.

Q. Now, turn your attention to Exhibit 9. And it's an email from a Mr. Zachary Pepin, if I'm pronouncing that correctly, to you.

A. Uh-huh.

Q. Does that look familiar to you?

A. Not offhand.

Q. I will let you take a look at it and read it.

A. Adero acquired StarBurst. Right?

Q. Correct.

A. Okay.

Q. You used the term -- first of all, do you recall receiving this email?

A. No. I don't.

Q. So if you don't recall receiving the email, would it be fair to say you don't recall doing



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

anything as a result of receiving the email?
A. I know I didn't do anything as a result.
Q. Mr. Pepin uses the phrase "orphaned product" in the second line from the bottom.
Do you see that?
A. Yes, I do.
Q. What does that mean, do you know?
A. That means to me that -- not knowing Mr. Pepin, that may be an erroneous phrase.
Q. Is that a term of art in the industry?
A. No. Not to my knowledge.
Q. What would be the implications, the viability of using StarBurst software if Adero had ceased providing technical support for it?
A. I think that -- I'm sorry, what is your name again?
Q. Reid.
A. Mr. Reid.
Q. No. Reid is my first name.
A. Oh, Reid. Reid, I believe that really depends upon the number of variables.
Q. Yes.
A. And I really believe that it primarily depends upon what CECOM was really doing with that software. If CECOM needed technical support for that


LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

software -- technical support being engineering bodies, consulting support -- and they couldn't provide -- and no one could provide it, I could understand where CECOM might be disconcerted as a result of that.

If CECOM, however, were just using the StarBurst product to run particular programs, then it might be academic whether or not they could get follow-on support or not. I just don't know.

Q. Okay.

A. Am I making sense here?

Q. Fine by me.

A. Okay. However, based upon everything I know, if CECOM was using the justification for not making the payment based upon the fact that they could not obtain adequate support, I believe that that was not a viable rationalization for their action.

Q. And that's because why?

A. Because I believe that support was available to them.

Q. From whom?

A. From Cache, a company called Cache.

Q. Now, Cache wouldn't support the Omniburst -- the Omnicast StarBurst --

A. 1.74 release?



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

Q. Right. It wouldn't support that. It would actually support its own proprietary software to do the same thing. Right?

A. Well, if it did the same thing, then logic tells me, "What's the difference?"

Q. Well, if --

A. I mean -- but I am becoming argumentative and I don't mean to be. I am just trying to think about this in my own mind.

Q. Sure. Let me give you what I think might be a counterexample and tell me why this is not true. I am not trying to argue with you.

A. No, I understand.

Q. Let's say, for example, I use Microsoft Word, which is made by Microsoft, and Microsoft goes out of business and stops supporting it, but there's a program called WordPerfect by Corel, which other people use for word processing and somebody would say is better. Some might not.

Could Corel give me technical support for my Microsoft Word?

A. They definitely could. And most particularly they could if they had the source code.

Q. Now, Swan International had the source code here for the Omnicast StarBurst information --

stuff, but --

A. So therefore -- so therefore, ergo --

Q. That's Swan International, but Cache did not.

A. But -- okay. Cache may not have had the source code, but they could have provided support, but maybe not as well as Swan. But Swan all the moreso could have provided support and even better support based upon our discussion because they did have the source code.

Q. Okay. But you have no recollection of receiving this letter, much less doing anything about it.

A. No. That's why -- yeah. Your statement is correct.

Q. Okay.

We will mark Exhibit 10.

(Deposition Exhibit 10 was marked for identification and is attached hereto.)

BY MR. PROUTY:

Q. That is actually -- if you flip all the way to the back, you will see it's signed by John del Bando.

A. Yeah. I don't see that. I see his -- I don't see his signature, but I see his title.



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com