Q. That's right. The signature block is John del Bando.

A. Yes.

Q. And this is a letter about the claim. I asked Mr. Bryan, the contracting officer. And I wanted to ask you what, if any, role you played in formulating the claim in this case and writing a letter such as this one.

A. Unfortunately, I don't want to say this -- can I talk off the record for a moment?

Q. I am afraid if it's helpful, I will probably want it on the record.

MR. GELTNER: Why don't you tell me.

BY MR. PROUTY:

Q. Are you concerned that it might be something that's --

A. No. It's really kind of detrimental to Mr. Geltner. In other words, let me just answer your question specifically.

Q. Tell you what. Let's go off the record -- we will go off the record for a moment and if it's something that I need on the record, I'll put it on the record. But if it's not, we can just keep it off the record, if that's okay with Mr. Geltner.

MR. GELTNER: Fine.



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

MR. PROUTY: Let's go off the record.
(Discussion off the record.)
BY MR. PROUTY:
Q. I think we were off the record to summarize -- you suggested, Mr. Bernstein, that you had very little to do with the drafting of this letter, this July 3, 2002 letter, because you were busy with other things at the time. Is that correct?
A. That's correct. Mr. Jeff Nolan was the primary individual in drafting the claim and the response to the claim.
Q. Who is Mr. Nolan?
A. Mr. Nolan was an associate of mine who also worked on the East Coast -- who worked on the East Coast, also involved in leasing transactions for Northrop Grumman.
Q. Why was Mr. Nolan involved more than you were?
A. Mr. Nolan was really kind of the one that the -- the individual that was kind of assigned to draft the letter and the claim. It was really kind of a delegation from me to Jeff.
Q. Jeff worked for you?
A. No. He didn't work directly -- he worked with me.



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

Q. And again, you did --
A. He worked for Guy Speers. We both worked for Guy Speers.
Q. And was there any reason besides you being busy with other matters that required you to delegate this to Mr. Nolan?
A. No. That was solely the only reason.
Q. Did you review an item -- a document such as this July 3rd letter?
A. Yes, I did.
Q. If there were things that you found were wrong, did you correct them?
A. Yes.
Q. Do you recall whether you made any corrections to this letter before?
A. I made -- yeah. I made some general corrections.
Q. Would reviewing it allow you to recall which corrections you made or not?
A. Perhaps, but I think it would take some time for me to do that.
Q. Let me put it this way then: Do you -- do you recall any letter going out which you later found out had inaccuracies in it because you had not had the opportunity to review it appropriately?

A. No.

Q. All right. We are done with 10.

We will mark this as Exhibit 11.

(Deposition Exhibit 11 was marked for identification and is attached hereto.)

BY MR. PROUTY:

Q. What this is is a bunch of emails.

I think the --

A. Let me just finish this.

Q. Oh, sure.

A. Okay.

Q. I was going to say, I think the first two pages constitute one sort of email stream and then Pages 3 and 4 are actually emails that came at a different time after the first two pages. Frankly, they were put in this order because of the order in which they were produced to us, but it wasn't intended to mislead or confuse anybody about the time these were sent out. If that makes any sense to you.

A. Okay.

Q. Now, going to the second page -- let's sort of do this in the right order. Actually, I apologize. The very bottom of the first page is sort of the header for an email from Harry Bryan at Gunter Air Force Base to John del Bando.



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

Do you see that?

A. Yes, sir.

Q. And if you flip to the second page, the body of the email is essentially asking for additional information. You see that?

A. Um-hum.

Q. And then they attach the letter.

Now, the response is on the first page. Sort of the internal Northrop Grumman response is on the beginning of the first page from John del Bando to Jeff Nolan and a number of people, including yourself.

Do you see that?

A. Yes, I do.

Q. And I see Mr. del Bando asking or tasking a number of people with responsibilities, Jeff, Robyn and Jerry.

Do you know if Mr. del Bando separately or otherwise gave you tasking as a result of receiving this letter?

A. He did not.

Q. Do you recall why he did not?

A. No, I don't.

Q. Now, if you flip to the third page of the exhibit, the top is an email from you.

A. Yes. Let me see the dates here.



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

Okay.

Q. I think the time stamps are correct. Essentially Mr. del Bando upon receiving the letter responded by delegating a number of responsibilities to different people and about the same time or shortly thereafter, you sent the brief letter here that's on the top of Page 3. Is that correct?

A. Yes.

Q. Now, you are telling -- "SSG" is the --

MR. GELTNER: So we have a clear record, you are referring to 458?

MR. PROUTY: Yes. Absolutely.

Q. Of course, now even more clear, 458 is the Bates stamp at the bottom right of the document.

A. Yes.

Q. "SSG" is the Air Force group in Alabama?

A. Yes.

Q. And I see you basically -- it strikes me you are interpreting what SSG wants in this one paragraph-long response. Is that correct?

A. I -- I don't think so.

Q. Okay.

A. And -- boy, I believe that this email from me was precipitated by a conversation that I had with a Mr. Jeff Titrud, T-I-T-R-U-D-E [sic], who was the

senior counsel for the Air Force at SSG.

Q. When did this conversation occur with Mr. Titrud?

A. I believe on or about October 17, 2002.

Q. But obviously before you wrote this email.

A. That's right.

Q. And --

A. I believe that's this --

Q. What do you recall about this conversation with Mr. Titrud?

A. Mr. Titrud, as I said, was the senior counsel for System -- for Standard Systems Group. Standard Systems Group was the entity that was the contracts branch for entering into the CECOM contract, so they by definition were concerned about the situation. And I believe this was the first time that I ever received a call from Jeff. Most of the -- Jeff Titrud.

Q. Yes.

A. On all the other conversations that I had with Mr. Titrud on various subjects, I initiated the call. But I believe Mr. Titrud called me, as I remember very indistinctly, but I believe he called me and said, "They are working on this claim and these seem to be the key elements that would be the

controlling points in them making a decision."

Q. I see. So you believe that this email was based -- it says, "Based upon the attached letter, what SSG wants is for us to provide evidence on two things" -- that you were taking your conversations with Titrud and applying it to the letter to sort of --

A. And I believe that the letter that was generated by Mr. Bryan was directed by Mr. Titrud.

Q. Let's refer to the last page of this exhibit. It has 459 in the bottom right-hand corner. It's a print-up by -- of an email from Mr. del Bando to Mr. Nolan and you. I see that there is some pen and ink marks, checkmarks, things of that nature on this document.

Would you happen to have any idea who made these remarks?

A. I don't. But I do know one thing. I know they are not mine, because --

Q. That was my next question.

A. No, they are not mine.

Q. Okay. Do you know Mr. del Bando's handwriting?

A. I did. And I don't believe that it was -- this doesn't look like his.



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

Q. Okay. What about Mr. Nolan?
A. No. I believe -- yeah. I would think that was Mr. Nolan's.
Q. Okay. Famous last words. I think this is my last exhibit for the day.
We will mark this as 12.
(Deposition Exhibit 12 was marked for identification and is attached hereto.)
BY MR. PROUTY:
Q. What I am interested here -- in here is not the content of the letter itself -- of the exhibit, but there is some handwriting on it.
A. Uh-huh.
Q. And I wanted to ask whether or not you knew whose handwriting that might be.
A. I don't know.
Q. Again, do you know whether or not this might be del Bando's?
A. It's possible.
Q. But you just don't know for sure.
A. No, I don't.
Q. I am done with that exhibit.
A. Okay.
Q. And after the claim was denied by the Air Force, did you have any further responsibilities or


LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

dealings with this matter?

A. Yes.

Q. And without commenting on things dealing with legal counsel, which I don't want to know about, what were they?

A. To -- to communicate the fact that the claim was denied to ePlus.

Q. Yes.

A. To discuss further strategy with them. And discuss any financial arrangements that would be necessary between the two companies.

Q. What type of financial arrangements?

A. There was -- again, I don't -- I'm sorry, my recollection is so vague, but there were still some shortfalls, I believe, that were due to Citizens Bank. Citizens Bank was the underwriting bank for ePlus. They were the -- Citizens Bank was the bank that actually came out with the cash, provided the money for the financing.

And we had made -- previous, I think, to the denial of the claim, we had made arrangements for taking care of the first payment with Citizens. The first delinquent payment. And I don't recall -- I don't believe we had made arrangements for taking care of the second delinquent payment.

We had no -- we, Northrop Grumman, had no obligation to do so, but just in the spirit of our working relationship, we wanted to make sure that Citizens was made whole.

Q. Okay.

A. So I believe we discussed at that point in time how to make Citizens whole for the final delinquent payment. And we then discussed arrangements for proceeding with the claim.

Q. Did you -- I guess that Northrop Grumman essentially paid out of its own pocket to ePlus and Citizens the lease money that it did not receive from CECOM?

A. For all intents and purposes, yes.

Q. You say --

A. Not -- not to ePlus. But to -- to -- not to ePlus at all, but to Citizens, yes.

Q. EPlus had its arrangement with you and you kept that arrangement.

A. That's right.

MR. GELTNER: Can I take a break and talk to him about it?

MR. PROUTY: Sure.

(Discussion off the record.)

///



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

BY MR. PROUTY:

Q. Mr. Bernstein, I think that when we went off the record, you had a chance to talk to Mr. Geltner. In fact, I was present. It was nothing confidential, but it was just a question of two individuals helping each other jog each other's memory about what might have happened.

It sounds like to me that during that conversation, you remembered a slightly more perhaps complex set of occurrences as far as making Citizens whole, et cetera.

Could you repeat your best recollection of what happened as far as that goes.

A. Yes.

Q. Okay.

A. Because of the relationship that Northrop Grumman had with Citizens Bank, we felt it imperative to assure that Citizens Bank was made whole because of the difficulty with CECOM. So we arranged with ePlus that ePlus pay Citizens the two payments that were not made by CECOM, thereby Northrop Grumman taking a shortfall in other transactions to compensate Citizens Bank, Citizens Bank being completely made whole. But as I stated previously, off the record, I don't know where that left ePlus financially.

Q. Do you recall whether or not Northrop Grumman compensated ePlus for its payments to --

A. No. That -- that we did not do.

Q. Do you recall if there was a means by which you induced ePlus to make those payments?

A. Yes, there was.

Q. What was that?

A. That was arrangements that we made on other transactions that were unrelated to CECOM.

Q. But they were to the benefit of ePlus and to the detriment of Northrop Grumman.

A. I think they may have been to the detriment of both companies.

Q. Okay. Well, if those arrangements were to the detriment of ePlus, why would they then agree to make Citizens Bank whole?

A. Because -- two reasons. Number one, because even though they were to the detriment of ePlus, by agreeing upon a reduced rate for the transaction, ePlus also had a very, very strong connection with Citizens Bank and so that allowed ePlus to maintain its relationship with Citizens and continued to do funding with Citizens. And it also allowed ePlus to, even though they would not have made as much money on this other transaction, at least make

a little money on the other transaction. So that's why it was to the detriment of both companies, in my judgment.

Q. Okay. Well, off that subject, I have asked you a lot of questions and you have been very, very helpful, especially in adding information that I didn't necessarily realize I should have asked and you did. But with that in mind, is there anything about the whole CECOM transaction that I haven't asked you about, but you think I should know?

A. Yes.

Q. Please tell me.

A. But I need to emphasize that this is not the position of Northrop Grumman.

Q. Correct.

A. To my knowledge, it's not the position of ePlus or Citizens, but it's just my own personal opinion.

Q. Okay.

A. I am particularly -- you know, you mentioned initially that, "It seems like you are pretty well aware of what went on with CECOM," although in my mind, I hadn't reviewed any of the documents whatsoever. But I -- but I was aware of it because this is -- this was a unique situation with



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

us.

I also felt in doing leasing that we were providing a major benefit to the government, and that benefit was we were providing the ability to the government to use a significant amount of software for strategic purposes that they would not have available to them had they had to go out and acquire it because they couldn't acquire it. So we provided a means for them to have something that they wouldn't otherwise have the opportunity to have.

In my judgment -- and we did that, recognizing that there were some risks in doing that, but we believed that we had mitigated those risks. Particularly on the I-CASE contract, we believed that we mitigated that risk by contracting with Standard Systems Group, who -- Standard Systems Group had the -- who was a government agency, had the responsibility of reviewing and clarifying and assuring the stability of each one of these transactions before they were done. There were a number of deals that we didn't do with a number of different government agencies because Standard Systems Group came back and told us, "This group is just not substantial. This group is not going to make these payments."



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

Well, SSG through their program manager, Barbara Starr, did a significant -- and Jeff Titrud, did a significant due diligence with CECOM and we were assured that even though this was a very small deal in relationship to the other deals we had did -- done, and a small deal has a lot of risks with it because the smaller the deal, the less that the agency has to risk if they don't make the payment, so they are more likely to not make the payment, but they -- we were assured through SSG this is a very, very solid deal.

We then received assurances through our -- you know, in my judgment, the -- which we have not mentioned at all -- the leasing terms and conditions, I need to speak much more than they -- they are. We haven't mentioned the leasing terms and conditions at all.

In my judgment, CECOM, the government, knew exactly what they were signing up for and they made a representation and warranty upon which Northrop Grumman relied to our detriment that was not fulfilled. That's disconcerting to me.

The other thing that I heard in discussing with the litigation attorney for CECOM in a number of conversations is that Joe Johnson and his organization were represented as being CECOM, an Army agency. But



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

they really weren't an Army agency. What they were were just leasing space from the Army and therefore that implied to me that Joe Johnson and his agent -- his entity was taking advantage of what we, Northrop Grumman, would provide to the Army, to the military, and as a lessor, was infringing on the ability to take what we would ordinarily reserve just for the Army. I thought that was inappropriate.

And I believe that the conversations I had with Mr. Johnson as well as the due diligence call I had with him were completely 180 degrees opposite. His actions were 180 degrees opposite of what he represented to us, which we relied upon.

So the last thing I want to say is that at this point in time I don't think -- Northrop Grumman Corporation and Barry Bernstein have no skin in the game. To me personally, it doesn't make any difference how this case comes out. But morally and ethically, I have some concerns about it.

That's it.

Q. Fair enough.

I believe we are actually done. Any questions?

MR. GELTNER: I have a couple of follow-ups just to clarify a few things that I think were a



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

little unclear.

EXAMINATION

BY MR. GELTNER:

Q. Early on in the deposition, I think you were asked the question did Logicon change its name, and you answered no and then later on, I think you said Logicon became Northrop Grumman Information Technology and it did change its name.

A. You are right.

Q. So I wanted a clarification to make sure we have a clear record of what your recollection is.

A. Right. The first year of the acquisition by Northrop Grumman of Logicon, Northrop Grumman allowed Logicon to retain its name. So even though Logicon was then owned by Northrop Grumman, they continued to do business and represented themselves in the marketplace as Logicon for one year.

After that year, Logicon then was -- reported to the commercial and state and local government entity of Northrop Grumman, so Northrop Grumman changed Logicon's name to Logicon, state and local government entity.

Thereafter, Logicon then reported to



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

another entity that was acquired by Northrop Grumman, which was called FDC.

So then Logicon changed its name to Logicon/FDC. And about the third year after the acquisition, Logicon/FDC became Northrop Grumman *Information Technology Application Solutions.* Application Solutions was a wholly owned subsidiary of Northrop Grumman Information Technology. And Northrop Grumman Information Technology is a wholly-owned subsidiary of Northrop Grumman Corporation. Or at least that was the situation at the time of this transaction.

Well, that was the situation up until the time that I retired, let's put it that way. Am I making sense?

Q. So your recollection, then, is Logicon, after going through a few of these wiggles in the middle, ends up being Northrop Grumman Information Technology, Inc.

A. No. It's Northrop Grumman -- it's really Application Solu- -- excuse me. It's actually Northrop Grumman Information Technology Computer Systems.

Q. Let's make sure -- are you talking about --

A. Application --
Q. -- business operational names or corporate?
A. Let me tell you about corporate entities. Logicon essentially became Northrop Grumman Information Technology Computer Systems. And Northrop Grumman Information Technology Computer Systems was a wholly-owned subsidiary of Northrop Grumman Information Technology.
Does that make -- do you follow me? So if I could just draw --
Q. I'm not sure I know.
A. Okay. So we started out as Logicon. Logicon was acquired by Northrop Grumman. We stayed Logicon for one year. We then ultimately became Logicon/FDC. And that was the combination of Logicon and FDC.
Logicon/FDC then became Computing Systems, which is a wholly-owned subsidiary of Northrop Grumman Information Technology. I believe that's what happened.
Q. What specifically -- what about Northrop Grumman Information Technology?
A. Northrop Grumman Information Technology is a -- about a $20 billion a year revenue wholly-owned

subsidiary of Northrop Grumman Corporation.

Q. Do you know if it has a relationship to Logicon?

A. Well, Logicon and Northrop Grumman Computing Systems is no longer in business. Remember, we withdrew from the marketplace this year.

Q. But what was --

A. But the relationship prior to us withdrawing from the marketplace was that Northrop Grumman Computing Systems was a wholly-owned subsidiary of Northrop Grumman Information Technology.

So there were three layers. So the ultimate upshot of all this was that there were three layers: There was Northrop Grumman. There was Northrop Grumman Information Technology. And there was Northrop Grumman Information Technology Computing Systems. Three individual legal entities. That's my ability -- I mean, that's my understanding.

Q. Let's go to another subject --

A. Am I clear on that?

Q. To the best --

A. It is what it is, yeah.

Q. It is what it is. That's the best that you can --

Let's --



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

MR. PROUTY: Mike, do you mind if I ask a follow-up on this while we are on the subject?

MR. GELTNER: Sure.

MR. PROUTY: I understand, of course, you have other follow-ups you want to ask, but it might be easier while we have got all the minds focused on this.

MR. GELTNER: Sure.

FURTHER EXAMINATION

BY MR. PROUTY:

Q. Now, earlier you stated that Logicon was bought or obtained by Northrop Grumman.

A. Yes.

Q. Was it obtained by Northrop Grumman itself or Northrop Grumman Information Technology? Back when it was Logicon/FDC and all that.

A. You know, Reid? I don't know specifically. But I believe -- if it's worth anything, I believe it was -- I believe it was acquired by Northrop Grumman. And here is the reason.

Prior to the acquisition of Logicon, Northrop Grumman had a small information technology group. It was really relatively insignificant

compared to the total Northrop Grumman. Northrop Grumman wanted to make information technology one of its five major business groups.

And so one way they did that is by expanding their small information technology and by -- through acquisitions. So they acquired Logicon, which was one of the predominant information technology software developers, and they developed a company called FDC.

And so at that point in time of the acquisition, then I believe what Northrop Grumman did is they made Northrop Grumman Information Technology a wholly-owned subsidiary of Northrop Grumman and then they -- then Northrop Grumman Information Technology made Computing Systems a wholly-owned subsidiary of Northrop Grumman Information Technology.

And the reason why Northrop Grumman Information Technology did that is because there was always this thought in their mind that they wanted to sell off Computing Systems. They -- that the resell business which Northrop Grumman Information Technology Application Solutions was involved in was not an integral portion of Northrop Grumman. So there was always this thought that they were going to sell it off. That's why it was a wholly owned subsidiary.



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

Q. So at one point --
A. Now, this is just my view.
Q. Of course. I understand. I understand.
At one point your understanding is that Northrop Grumman IT and Logicon were sort of parallel on the corporate structure of Northrop Grumman and then later on, Logicon, which later became whatever name it was, was moved underneath --
A. They were subsumed into Northrop Grumman IT.
Q. Right.
A. Yeah.
Q. But they were subsumed as a wholly-owned subsidiary.
A. That's correct.
Q. So they -- or again, Northrop Grumman, one level. Next level down, NGIT. Next level down, NGIT Computer Systems --
A. Computing Systems.
Q. -- who is in fact what used to be Logicon.
A. That's right. Logicon and FDC.
Q. Right. Because Northrop Grumman Computing Systems is not just Logicon, but is Logicon plus another corporation called FDC.
A. Well, Northrop Grumman Information

Technology Computing Systems is not only Logicon, but it's also FDC.

Q. Got it.

A. Now, one last wrinkle --

Q. Please.

A. -- is that FDC and Northrop Grumman Information Technology Computing Systems at the end of the year will no longer be in existence.

Q. And do you know what is going to happen to them?

A. Yes. There was an announcement by Northrop Grumman about two months before I retired that Northrop Grumman was exiting the reselling market. And so we had direction to wind up our operations and there was a press release saying that Computing Systems would be completely wrapped up by the end of the year.

Q. Do you know who will have the accounts receivable, et cetera, from Computing Systems? Will it go to NGIT?

A. No. It will all go through NGIT, yeah. It will all go through NGIT. I can provide you names of people there if you are interested. The best person --

Q. Yes.



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

A. -- I think, for this kind of information would be a gentleman named Jay Weitzel.
Q. J-A-Y?
A. J-A-Y, W-E-I-T-Z-E-L. And he's senior counsel for Northrop Grumman, who is responsible for many of the activities within NGIT.
Q. Okay.
I am done on that. Back to you.

FURTHER EXAMINATION

BY MR. GELTNER:
Q. Just wanted to clarify a couple other points.
Going back to 1999 when you did the transaction, that is, when Logicon did the transaction with CECOM and with StarBurst, did you have any belief that this was -- let me put it another way. Strike the question and I will put it another way.
When Northrop Grumman acquired the software from StarBurst, was Northrop Grumman relying on the representations made in the essential need letter, which was Exhibit 2?
A. Mike, 100 percent. Let me tell you, because I am speaking for Northrop Grumman, because I

would not have allowed Northrop Grumman to acquire the software from StarBurst had we not 100 percent known that CECOM was going to continue through this transaction.

Q. Did you on behalf --

A. It wasn't -- let me -- and I have to say this. It wasn't worth it to us, particularly on the small deal. Why should we risk a couple-hundred-thousand-dollar deal in ruining one of our major capital funds at Citizens Bank? Why would we -- I mean, we were doing -- I mean, I have done $500 million worth of business, a hundred million dollars' worth of business with Citizens. Why would I risk a hundred-million-dollar deal with Citizens because of a million-dollar deal that was going to go bad?

Q. Did Northrop Grumman believe that the warranty it was getting in the essential need letter was part of the basis of its bargain?

A. Yes. But in addition to that, we also relied upon the terms and conditions of the lease agreement itself, which was -- I mean, which to me are explicitly clear.

Q. This was where we went to -- I am going to show you a document that was marked as Exhibit No. 3



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

in Mr. Johnson's deposition, which is the initiating delivery lawyer -- delivery order. I am turning to the leasing terms and conditions.

Do you have a copy of it with you?

MR. PROUTY: Not on me, I don't.

MR. GELTNER: It wasn't marked today.

Q. We can all take a look at it. The question I want to ask you -- this is the leasing terms and conditions. I am particularly interested in the paragraph before the numbering and the reference to the essential use letter.

MR. PROUTY: I am just going to come behind you and look at it.

MR. GELTNER: It's the only copy with me. I'm sorry, I hadn't expected to use it.

MR. PROUTY: That's quite all right.

BY MR. GELTNER:

Q. Take a minute to look at it and then tell us if you know anything about -- I will ask you two questions really: Do you know anything about how this language came about and do you know what its relationship is to the essential need letter, which was marked as Exhibit 2 today?

A. Are you asking me about --

Q. I am asking you two questions. But I want



*LegaLink, a Merrill Communications Company*
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

you to read it first.

A. I do know how the language came about. I drafted the language. And I incorporated it in the leasing terms and conditions, which was an integral part of our proposal, to Standard Systems Group.

And the second part of your question was, how did this relate to the essential need statement. I personally, and I believe Northrop Grumman personally, relied upon this statement within the leasing terms and conditions because it was reviewed and approved and the lease was conditioned upon the review and approval of Jeff Titrud, who was the senior counsel of the Air Force, who was the contracting agency.

So I know explicitly -- it's not that -- you know, it's possible that a technical representative like Joe Johnson could say, "Well, gee, I didn't know what that meant," or, you know, "I just blew it off. I don't know what that means. I don't care about that stuff."

But it's not plausible for me, for the program manager, Ms. Barbara Starr, who we dealt with at SSG many, many years, who did contracting, for the contracting officers at SSG and the senior counsel at SSG not to know what these words were because we



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

talked about them for many -- on many occasions. And they knew that we were relying on, to our detriment, that if an agency entered into a lease financing agreement, that's subject to two things. Nonappropriation -- if they were not appropriated funds, they could walk away and there is no problem whatsoever.

Or if -- in accordance with the essential need statute, they could walk away, but we pre-empted that by them agreeing that there was an essential need. And we relied upon that in entering into the transaction.

Q. Let me ask the question another way.

You were aware -- and by "you," I mean you on behalf of your role for Logicon were aware that the government had a series of option years and therefore that there was some risk that the government would not renew options.

A. Right.

Q. And in your own words, can you tell us what was the relationship of the warranty language you wrote and the essential need letter to the risks involved in the government walking away from the contract.

A. The option years provide that the



*LegaLink, a Merrill Communications Company*
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

government -- and by "the government," that is, the contracting officer -- this is to -- in order to comply with the Antideficiency Act, the government through the contracting officer must take an affirmative action every fiscal year to renew the contract.

And if the government through the contracting officer does not take that affirmative action, then the government has no further obligation. We incorporated that into our leasing terms and conditions to comply with the Antideficiency Act.

But we also then on the other side implemented the due diligence call and the essential use statement that says that subject to nonappropriation of funds, the government represents and warrants that they will exercise each year's option.

So the contracting officer, the government's attorneys and the program manager are saying that subject to nonappropriation of funds, we will continue on with the transaction.

Q. Take a look again at -- just a follow-up with -- take a look again at Exhibit No. 2. I don't believe that Exhibit No. 2 says that the government will appropriate funds. So I wonder if you could

explain to us what you think the relationship is of the information, Exhibit No. 2, to the nonappropriation or to the nonrenewal of risk.

A. Are you -- Mr. Geltner, are you saying that there is no mention of Exhibit No. 2 talking about a nonappropriation?

Q. Well, just read it.

A. Okay.

Q. Just read -- in other words, I guess my question is, what did the essential need letter give you that you thought you needed to get in order to protect yourself against this -- the government's rights under the Antideficiency Act?

A. What the essential need letter gave us was the representation that the only possibility for the government not continuing with the lease would be nonappropriation of funds. That the essential need -- essential need letter provided us the confidence that the government would not attempt to evade or avoid its payment obligations because of a lack of bona fide need.

Really what the essential need statement says is that the government does have a bona fide need. They are representing that it does have a bona fide need for the term of the lease.



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

Q. Okay. I think it's clear to me.
I think I am done. You might want to follow up.
MR. PROUTY: I have one follow-up.
MR. GELTNER: You want me to keep this out?
MR. PROUTY: I don't need that one to be out anymore.

FURTHER EXAMINATION

BY MR. PROUTY:
Q. Joe Johnson, in your dealings with him, did he ever represent to you that he was a contracting officer --
A. No.
Q. -- or had a contracting officer's warrant?
A. Not at all.
MR. PROUTY: That's it. Thank you so very much.
THE WITNESS: But --
BY MR. PROUTY:
Q. Okay.
A. -- in many of the conversations that I had with him, he had Mr. Eric Stern with him, who he represented was a contracting officer.



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

Q. Was Mr. Stern with him during the conversations leading up to the signing of the essential need letter?

A. That, I don't know.

Q. Okay.

A. But I do know that he had conversations with SSG and their contracting people.

Q. Yes.

Okay. Nothing further for me.

MR. GELTNER: That's it.

(At the hour of 1:37 P.M., the deposition was adjourned.)



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

DECLARATION

I, BARRY J. BERNSTEIN, hereby declare under the penalties of perjury of the State of California that the foregoing is true and correct.

Executed this 28 day of August, 2006, at Woodland Hills, California.

BARRY J. BERNSTEIN



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

I, JARDENE L. PLATT, RPR, CSR No. 3724 in and for the State of California, do hereby certify:

That prior to being examined, the witness named in the foregoing deposition was by me duly sworn to testify as to the truth, the whole truth, and nothing but the truth;

That said deposition was taken before me at the time and place therein set forth and was taken down by me stenographically and thereafter transcribed via computer-aided transcription under my direction;

I further certify that I am neither counsel for, nor related to, any party to said action, nor interested in the outcome thereof.

IN WITNESS WHEREOF, I have hereunto subscribed my name this 14th day of August, 2006.

JARDENE L. PLATT, RPR, CSR No. 3724



LegaLink, a Merrill Communications Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

ERRATA SHEET

| PAGE | LINE | CHANGE CORRECTION |
|---|---|---|
| 54 | 22 | "Page" should be "Stage" |
| 69 | 2 | "Explicate" should be "Explain" |
| 74 | 8 | The second "no" should be "Know" |
| 74 | 24 | "... They were going" should be "They were not going" |
| 88 | 25 | "Could" Should be "Would". |
| 90 | 25 | "general" should be "gentleman" |
| 102 | 7 | "moreso" should be "more so" |
| 121 | 6 | "Application Solutions" should be |
| 121 | 7 | "Computing Systems" |
| 125 | 8 | Strike the word "developed". In |
| | | place thereof insert "Acquired" |
| 125 | 22 | Strike "Application Solutions" |
| | | Insert "Computing Systems". |

App. 298

**Bernstein, Barry**

| | |
|---|---|
| From: | Speers, Guy |
| Sent: | Wednesday, September 22, 1999 12:34 PM |
| To: | Bernstein, Barry |
| Subject: | FW: Additional Clause in the MIPR |
| Importance: | High |

Barry,

Check out the acceptance clause and warrant below. Will this create a problem? At the very least, we don't want to pay Starburst until acceptance is made. At least Oct 15 as an acceptance date will not drag things out.

Guy

-----Original Message-----

| | |
|---|---|
| From: | Soltis, Jerry |
| Sent: | Wednesday, September 22, 1999 9:16 AM |
| To: | Speers, Guy; Bernstein, Barry; Frederick, Bonnie |
| Subject: | FW: Additional Clause in the MIPR |
| Importance: | High |

FYI.....Rick continually says "contract" when he means "Special Offer".
Bonnie, pls contact Mr. Booker and ensure that he has a copy of the special and the ICASE ordering procedure sheet..THX, Jerry

-----Original Message-----

| | |
|---|---|
| From: | Richard O'Brien [SMTP:robne1@ibm.net] |
| Sent: | Wednesday, September 22, 1999 10:16 AM |
| To: | Jsoltis@logicon.com |
| Cc: | gspears@logicon.com; jjohnson@c3smail.monmouth.army.mil; edurkin@starburstsoftware.com; hbooker@c3smail.monmouth.army.mil; estern@c3smail.monmouth.army.mil; tom_prior@starburstsoftware.com |
| Subject: | Additional Clause in the MIPR |

Jerry,
Be advised that the following events have unfolded so far, today:
1.) Met with Joe Johnson and Harold Booker (732) 427-4055 who is executing the MIPR in Eric Stern's absence. The MIPR will be sent ($100K) to the Logicon ICASE SPO at Gunther AFB later this morning to initiate the ICASE contract. The rest of the funds are budgeted.
2.) StarBurst agreed to warrant that Solaris OmniCast vers. 1.7 will operate over NTDR tactical radio comms links.
3.) An additional term for acceptance testing by Mitre to confirm this functionality by October 15, 1999 is now to be added to this contract.
4.) No other changes are expected or approved.
5.) Logicon will work on getting the paper to process out of the SPO and purchase order to StarBurst prior to September 30, 1999 or all terms and conditions expire.

Additionally, Mr. Ed Durkin, StarBurst CFO will be contacting Mr. Booker to discuss the exact phrasing of this extra condition so your offer paperwork might have to be revised to reflect this change. Mr. Booker was going to contact Bonnie this morning to obtain another copy of the original Logicon ICASE contract offer in case he cannot contact Mr. Stern to locate the Logicon folder.

Thanks,
Rick

App. 299

Ed Durkin CFO
(978) 287-5560 X 233

EXHIBIT 1
JARDENE L. PLATT, RPR, CSR No. 3724
DATE: 8-2-06



000551

22 SEP 1998

MEMORANDUM FOR LOGICON INFORMATION TECHNOLOGY GROUP
ATTN: JOHN del BANDO
222 WEST SIXTH STREET
P.O. BOX 471
SAN PEDRO, CA 90733-0471

FROM: PEO C3S

SUBJECT: Letter of Essential Need

1. This letter is intended to clarify the essential need of the Program Executive Office, Command, Control and Communications (PEO C3S) for the "Starburst Software License Lease Agreement" currently being prepared for implementation. The planned acquisition consists of a delivery order to be written under the I-CASE Contract (Number F01620-94-D0002), incorporating a lease agreement through Logicon Corporation for use by PEO C3S.

2. PEO C3S has decided to enter into a lease agreement for the Starburst database products to support ABCS 6.0 and beyond. These products are essential to the operation of ABCS 6.0 as they are integral to the system. After considering the alternatives, it was determined that a lease was the most cost-effective means of providing long-term, Program-wide access to the Starburst products.

3. Funding limitations require that the lease plan be structured with payments in annual increments, not to exceed one year's duration each. As outlined in the I-CASE Lease Agreement terms and conditions, the parties understand and agree that the form of the agreement is a lease. The Government shall not be obligated to continue performance during the full period of the lease, if pursuant to FAR 52.232-19, funding for the lease asset and above-mentioned life-cycle operations is not appropriated and is, therefore unavailable during any Government fiscal year applicable to the effective lease term. However, the Government intends to use its best efforts to annually obtain funds to support the lease under each applicable delivery order.

Signed,

Joseph E Johnson

JOSEPH E JOHNSON
CH, Horizontal Technology Integration Office

App. 300

EXHIBIT 2
JARDENE L. PLATT, RPR, CSR No. 3724
DATE: 8-2-06

000302

Johnson Dep Ex 2

StarBurst Software

September 29, 1999

Mr. Barry Bernstein
Logicon, Inc.
222 W. 6th Street
San Pedro, CA 90733

EXHIBIT 3
JARDENE L. PLATT, RPR, CSR No. 3724
DATE: 8-2-06

RE: Assignment of Rights to Payments Related to StarBurst Software Sublicensed by Logicon for use by The U.S. Government

Dear Mr.Bernstein:

We understand Logicon and various agencies of the U.S. Government have entered into a Delivery Order pursuant to Contract No. F01620-94-D-0002 dated as of April 12, 1994, whereby such U.S. Government end user agencies will contract to sublicense a StarBurst software license (the "License") from Logicon, reflecting the software products as follows:

1. StarBurst Omnicast Server-to-Server License; Product Part Number 131-WNT-0025 NT Server, NT or Win 95 clients; 60 licenses, as set forth on Logicon PO # 29033001 Dated September 29, 1999, for Mr. Joseph Johnson of the Horizontal Technology Integration Office at Fort Monmouth New Jersey.
2. Basic Maintenance for FY 2000

We understand Logicon intends to finance the acquisition costs of such License, by assigning to MLC Federal, Inc. ("MLC") ("Assignee") the installment payment obligations due from the U.S. Government to Logicon pursuant to a lease agreement (the "Lease") for use of the License (together with other rights including the right to terminate the License), in return for MLC's payment to Logicon.

We further understand Logicon has agreed to the following, and requests that StarBurst signify its agreement with the same as provided below:

1. Starburst agrees that for a period of one year from the date of any non-renewal or termination of the License referred to above, pursuant to Section 1 (a) of the Lease, Starburst will not replace said License with the above referenced U.S. Government end users.

   If the Government terminates the License for the convenience of the Government and Logicon elects not to pursue a termination claim against the U.S. Government end users, Logicon will provide written notice to StarBurst of this election within thirty (30) days of said termination, and StarBurst shall not be limited or otherwise restricted in any actions it may take with respect to the provision of additional or replacement software licenses to the above referenced U.S. Government end users.

2. StarBurst agrees that it will take no actions which will cause the U.S. Government to exercise their rights to not renew or terminate the Software License pursuant to Section 1 (a) of the Lease.

3. Starburst hereby consents to the assignment from Logicon to MLC of the right to limit the Government's use of the License acquired under the applicable Logicon Delivery Order pursuant to Contract No. F01620-94-D-0002 and the right to require surrender of the licensed software or obtain a



StarBurst Software 150 Baker Avenue Concord, Massachusetts 01742 USA

certificate of non-use from the above referenced Government end users provided that such assignment shall not include any assignment of title or ownership or any sublicense or security interest in the License. Assignee shall not copy, resell, transfer, relicense, or remarket the License for any purposes, nor shall it receive, redirect or cancel any of the services provided under the applicable Delivery Order pursuant to Contract No. F01620-94-D-0002.

4. Logicon and MLC shall not require Starburst to relicense or otherwise remarket the License in mitigation of any damages to MLC. Starburst shall have no liability to MLC for any claims or liabilities or other actions. Any further assignment of Logicon/Government's right to use the License or receive services shall be subject to Starburst's prior written consent.

5. Starburst agrees that in the event of a casualty loss of the applicable software subject to the License delivered by Starburst pursuant to the applicable Logicon Delivery Order /pursuant to Contract No. F01620-94-D-0002 to provide the above referenced Government end users with replacement of said software free of charge.

This letter shall serve to signify StarBurst's review and agreement with the all of the foregoing.

Please feel free to call on me should you have any questions.

Very Truly Yours,

Edward M. Durkin
Vice President, Chief Financial Officer, Treasurer