IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| NORTHROP GRUMMAN INFORMATION TECHNOLOGY, INC. | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 05-595C |
| THE UNITED STATES, | ) | (Senior Judge Smith) |
| Defendant. | ) | |

DECLARATION BY JOSEPH E. JOHNSON

I, Joseph E. Johnson, make the following declaration in accordance with 28 U.S.C. § 1746. I am aware that this declaration will be used in the United States Court of Federal Claims, and that this declaration is the legal equivalent to a statement under oath.

1. My name is Joseph E. Johnson and I am an employee of the United States Army ("the Army"), in Fort Monmouth, New Jersey. I work for the Program Executive Officer ("PEO") for Command Control Communications Tactical ("C3T") and have held that position since 1989.

2. In 1999, I was Chief of the Horizontal Technology Integration Office ("HTIO"). The job of HTIO was to explore Research and Development ("R & D") technologies for potential application and use in PEO C3T programs, as well as to look across different Army programs and identify potential for integrating them horizontally. In other words, as one of its primary objectives, HTIO sought to leverage new technologies to ensure that separate Army programs were able to "horizontally integrate" or, more simply put, work together.

3. Part of my job in 1999 involved investigating and, when needed, procuring software for potential use with the Army Battle Command System ("ABCS"). ABCS was a means for Army commanders to communicate with their troops and staff on the battlefield using computers and a radio net. It involved not only the ability to send and receive messages, but the ability to

share data amongst units. The ability to transmit data and messages was a critical component of the ABCS system. Because of the large amounts of data involved in such communications, we continually sought means to improve the efficiency of the data transfer for the ABCS.

4. In the spring of 1999, I was approached by Mr. Rick O'Brien, a salesman for the company, Starburst. Mr. O'Brien briefed me about a software product from Starburst called "Omnicast." The Omnicast software provided what was billed as a "revolutionary" means of providing data to multiple receivers using one transmission from the data source. This was a far different approach than that being used by pre-existing technology. For example, an e-mail to multiple users was typically sent by a separate transmission to each user. The Omnicast transmission method promised to provide a far more efficient use of limited "bandwidth." Mr. O'Brien suggested to me that the Omnicast software could be integrated and used as part of our larger ABCS software and make it more efficient. At some point, I agreed with Mr. O'Brien that the Omnicast software had the potential to improve the operation of the ABCS system. Accordingly, I sought to procure sufficient copies of the software to allow for testing with the ABCS system in the field. If it performed in the field as successfully as Mr. O'Brien promised, I anticipated recommending to the procurement authority the procurement of additional software licenses for the Omincast software in the future. Mr. O'Brien gave me reason to believe that he understood this and the number of software licenses I was going to procure were plainly too small a number to be used Army-wide.

5. In the early Fall of 1999, Mr. O'Brien and I spoke about the means by which the Army would procure the initial software for testing purposes. Starburst did not have a pre-existing contract with the Government for selling software, thus there was no pre-existing

method for us to obtain the software directly from Starburst. Mr. O'Brien suggested using another vendor to buy the software from Starburst. The idea was that Logicon, a company with a pre-existing contract allowing the sale of off-the-shelf software to the Air Force, would purchase the Omnicast software from Starburst and provide it to us and we, in turn, would pay Logicon for the software through the Air Force contract. I agreed to this procurement method and Logicon was amenable to this arrangement as well.

6. At some point before the procurement, Mr. O'Brien and I also discussed the idea of leasing the Omnicast software instead of buying it. The lease had the advantage of spreading out the payments, and I agreed to it.

7. Mr. DelBando or another individual from Logicon provided me a "letter of essential need" (which is reproduced on page 84 of plaintiff's appendix) and asked me to sign it in order to aid in establishing the lease. I agreed. I did not personally draft this letter, nor did anybody from the Government. In none of my conversations with Mr. O'Brien or any individual from Logicon did I ever assert that the Omnicast software was guaranteed to be used in the ABCS; rather, I made clear to both that we were still at the research and development stage and merely hoped that the Omnicast software could be used as an integral part of the ABCS if it proved successful in its testing. Indeed, in September 1999, Mr. O'Brien suggested a meeting (including a Logicon representative) to discuss the option of increasing the number of Omnicast licenses from the 60 being procured to 1860 if the software tested successfully and we decided to apply it Army-wide. To be clear, the Omnicast software was an integral part of the ABCS system as we were planning to develop it.

8. After the Air Force signed the purchase order for the Omnicast software and it was delivered, we commenced testing it in battlefield conditions at Fort Hood ,Texas. These tests turned up several problems which would preclude future use of the Omnicast software in the ABCS if they were not remedied. One problem was that the software interface was not user-friendly to the soldier in the field. I discussed this matter with Mr. O'Brien, who promised that future releases of the software would have a graphic users interface ("GUI"). Another problem was that the software reacted poorly when different transmitters and receivers came on and off line, as would be common in a battlefield environment. The end result was that message queues built up in length and vital messages were not sent in a timely manner. If these problems were not remedied, the Omnicast software would be detrimental to the ABCS system. Mr. O'Brien promised that these problems would be remedied in subsequent releases of the software.

9. On about March 15, 2000, I received a copy of a letter from Starburst software announcing that it had been obtained by another software company and would cease updating the Omnicast software and would only provide an additional 12 months of customer support for existing customers. This meant that it would be impossible to use the Omnicast software in the ABCS because it would be unsupported and because the glaring problems needing remedy would never be addressed by Starburst as promised.

10. Although I discussed the matter with Logicon, there was no means to make the Omnicast software a viable alternative in the ABCS at this point. Ultimately, we decided to not renew our lease of the now-useless software, uninstalled it, and offered to return it to Logicon. Simply put, the Army had no bona fide need for Omnicast software which was unworkable and

we never used it again. We never obtained any other software utilizing the "revolutionary" data transmission method utilized by the Omnicast software.

I have read the foregoing 5 page declaration and I certify under penalty of perjury that it is true and correct.

s/Joseph E. Johnson
Joseph E. Johnson
Program Executive Office
United States Army

Executed this 20th day of December, 2006.